LAZARSKI LAW PRACTICE, P.C.
Bryan J. Lazarski (SBN 248349)
1901 Avenue of the Stars, Ste. 224
Los Angeles, CA 90067
Tel: (323) 952-3200
Fax: (310) 461-1304
bryan@lazarskilaw.com
Attorney for Plaintiff
GLEN KELLEY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

GLEN KELLEY, an individual Nevada citizen,

Plaintiff,

vs.

FUNDOMATE, INC., a California Corporation; FUNDOMATE, LLC, a Delaware Limited Liability Company; SAM SCHAPIRO, an individual California citizen, and DOES 1-10, inclusive,

Defendants.

Case No.: 2:22-cv-05814

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

1. **Breach of Written Contract/Unpaid Wages;**
2. **Fraudulent Inducement;**
3. **FEHA Religious Discrimination in Employment;**
4. **FEHA Religious Harassment in Employment;**
5. **Wrongful Termination in Violation of Public Policy**
6. **FEHA Failure to Prevent Discrimination and Harassment**
7. **Failure to Reimburse Expenses (Cal. Labor Code sec. 2802)**
8. **Waiting Time Penalties (Cal. Labor Code sec. 203)**

**DEMAND FOR JURY TRIAL**

Plaintiff Glen Kelley hereby alleges as follows:

**PARTIES AND JURISDICTION**

1. Plaintiff Glen Kelley ("Mr. Kelley" or "Plaintiff") was at all relevant times herein a resident and citizen of the state of Nevada.

2. On information and belief, Defendant Fundomate, Inc. is a California corporation, with its base of operations in Los Angeles County, California. At all times herein, Fundomate, Inc. has employed in excess of five (5) employees.

3. On information and belief, Defendant Fundomate, LLC is a Delaware Limited Liability Company, with its base of operations in Los Angeles County, California. On further information and belief, no member of Fundomate, LLC is a citizen of Nevada. At all times herein, Fundomate, LLC has employed in excess of five (5) employees. As used herein, "Fundomate" shall refer collectively to Fundomate, Inc. and Fundomate, LLC, which are operationally one-and-the same.

4. On information and belief, Defendant Sam Schapiro ("Mr. Schapiro") is the primary shareholder of Fundomate, Inc, a member of Fundomate, LLC, and the Chief Executive Officer of Fundomate. On further information and belief, Mr. Schapiro is a California citizen who lives and works in Los Angeles County. As used herein, "Defendants" shall refer to Fundomate collectively with Mr. Schapiro.

5. The true names and capacities, whether individual, corporate, or public, of defendant sued herein as Does 1-10, inclusive, are currently unknown to Plaintiff, who therefore sue such defendants by fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of the defendants designated herein as a Doe is legally responsible in some manner for the unlawful acts referred to herein.

6. The events that are the subject of this Action largely occurred in and around Los Angeles, California, which is where Fundomate's business operations are centered.

7. Mr. Kelley was hired by Fundomate on or about April 29, 2020 as its President and Chief Operating Officer.

8. Mr. Kelley was involuntarily terminated on or about November 18, 2020, which he was informed of via a Whatsapp message from Mr. Schapiro on November 17, 2020.

9. At all times mentioned herein each and every defendant was the agent, representative, employee, servant or affiliated entity of every other defendant and, in doing the acts herein alleged, each defendant is liable and responsible to Plaintiff for the acts of every other defendant.

10. As set forth below, the amount in controversy exceeds $75,000.

11. This action is brought pursuant to the Fair Employment and Housing Act ("FEHA")(California Government Code §§ 12900 et seq.), and state and federal statute, as applicable. Fundomate is an Employer as the term is defined in California Government Code § 12926(d). Plaintiff has timely exhausted his administrative remedies pursuant to the FEHA and obtained a Notice of Right to Sue from the Department of Fair Employment and Housing on August 16, 2022.

12. Based on all of the above allegations, this Court properly has jurisdiction over this matter, and venue is proper in the Western Division.

## FACTS COMMON TO MULTIPLE CAUSES OF ACTION

### I. Background Facts

13. Fundomate was started in or about 2017 by Mr. Schapiro and Nir Bareket to provide automated financing, banking and other business services to merchants.

14. Mr. Kelley is a well-respected banking executive who, prior to being hired by Fundomate, spent among other places, 23 years with Wells Fargo as an Executive Vice President and the Head of Merchant Services, the largest Merchant Services business in the world.

### II. Negotiations with Defendants and Compensation Terms

15. In 2019, Mr. Kelley and Mr. Schapiro were introduced while Mr. Kelley was the Chief Revenue Officer of Poynt, where he entered into a deal on behalf of Poynt

with Fundomate. Subsequently, he and Mr Schapiro began discussing the possibility of Mr. Kelley coming to work for Fundomate.

16. At the same time, the COVID-19 pandemic had just fully emerged and was causing substantial uncertainty in all areas of business. Mr. Schapiro indicated his concern over the effect of the pandemic on Fundomate's business and the urgency for Mr. Kelley to lead efforts for Fundomate to secure sufficient capital to allow operations to continue through the uncertainty of the coming months and years. Specifically, Fundomate was looking to raise capital by way of one or both of a warehouse line of credit or a private equity investment. Mr. Kelley was recruited for his expertise in securing such capital, where he has both deep business experience and contacts in these areas. Mr. Kelley was told by Mr. Schapiro that far-and-away the top priority was securing a warehouse line of credit with a mainstream bank, to replace the expensive and complex group of Limited Partner Investors (about 80 individuals and entities) who had up until that time provided the capital to be lent out to Fundomate's customers.

17. Mr. Kelley was also being recruited by Fiserv, the largest Point-of-Sale processing company in the United States. Mr. Kelley simultaneously proceeded with the recruitment process at Fiserv and Fundomate, getting to the point in Fiserv negotiations where compensation terms were being discussed.

18. Mr. Kelley and Mr. Schapiro engaged in substantial arms-length negotiations throughout the second half of March and April 2020. At the end of April 2020, the substance of their agreements was reduced to writing as the April 29, 2020 "Employment Offer from Fundomate," (hereinafter, the "Offer Letter"), which was signed by Mr. Schapiro on April 29, 2020 and Mr. Kelley on April 30, 2020. A true and correct copy of the Offer Letter is attached hereto, and incorporated by reference, as **Exhibit A**.

**a. Base Salary Compensation**

19. Substantial negotiations were held between Messrs. Schapiro and Kelley

regarding the compensation terms memorialized in the Offer Letter. From these negotiations, it was agreed Mr. Kelley would be paid a base salary of $350,000.00, as stated in the Offer Letter.

20. However, after Mr. Kelley accepted the Offer Letter and prepared to start work on May 11, 2020, Mr. Schapiro suddenly changed the terms of the Base Compensation to “an actual monthly gross payment of **$15,625**.” This was memorialized in the May 11, 2020 “Addendum to Employment Offer from Fundomate,” a true and correct copy of which is attached and incorporated by reference hereto as **Exhibit B**. (Hereinafter referred to as the “Addendum”).

21. Mr. Kelley was placed in a position where he had no reasonable choice but to agree to the Addendum, or else he risked losing his employment all together, including the Equity Compensation set forth in Section 4 of the Offer Letter.

22. Thereafter, when Mr. Kelley started working, Fundomate only paid him $8,333.34 per month through the end of August 2020 – a reduction from the already-reduced Addendum amount of nearly 50%. This reduction was foisted upon Mr. Kelley when he started because of the ostensible issues created by the COVID-19 pandemic, and under the guise that Fundomate need to pay him less in order to comply with the terms of the Paycheck Protection Program (PPP) loans it acquired. However, this explanation was always grounded in a misstatement of the law with regard to PPP loans. Moreover, as a practical matter the further reduction after the signing of both the Offer Letter and Addendum made little sense because Fundomate had already secured $262,500.00 in PPP loans as of April 12, 2020, so any issue as to Mr. Kelley’s compensation limits would have been known to Fundomate at the time the agreements were signed.

**b. Bonus Compensation**

23. In addition to the Base Salary, the Offer Letter provided for a bonus with a “target annual bonus amount equal to 100% of **the Base Salary**” if certain objectives were met. [See Offer Letter at Section 2(b); Emphasis in original].

24. Section 2(b) of the Offer Letter continued, "Objectives for earning the Performance Bonus, will be set by the CEO, and will be discussed, developed and distributed before year-end for the calendar year and reporting period, and is payable in Q1 2021."

25. Although the exact Bonus qualification terms were not agreed on as part of the Offer Letter, Mr. Kelley reasonably relied on Mr. Schapiro's promises that those parameters would be discussed in good faith and finalized in the coming weeks. To that end, on April 27, 2020, Mr. Schapiro sent Mr. Kelley a text message saying "Bonus is not a gaurntee (sic.). Unless xyz happens that we will define." However, after Mr. Kelley started working, Mr. Schapiro refused to fully define the Bonus terms as promised. Mr. Kelley made numerous attempts to get Mr. Schapiro to define the terms, but each attempt was either rebuffed or ignored, with one notable exception as explained below.

26. The only Bonus term that Mr. Schapiro made any effort to define during Mr. Kelley's employment related to his securing of a warehouse line of credit. Mr. Schapiro told Mr. Kelley at the outset that the top priority would be to obtain a warehouse line of credit to allow Fundomate to continue building out its proprietary platforms during the pandemic. Mr. Schapiro told Mr. Kelley that if he could secure a line of credit for $25 Million or more, he would be entitled to a Bonus of 1.5% of the total amount of that line of credit. These terms are memorialized in a number of text messages and emails between Messrs. Kelley and Schapiro, including but not limited to the September 17, 2020 email exchange described below.

27. Securing the warehouse line of credit required two elements of work: First, Fundomate's financial statements and records had to be prepared in a more sophisticated manner in keeping with industry standards for raising capital; Second, contacts had to be made with professionals in the industry to find a suitable partner to provide the capital sought. Mr. Kelley devoted substantially all his working time between May and

November 2020 to these two endeavors on behalf of Fundomate.

28. As detailed below, Mr. Kelley diligently took all reasonable steps to put Fundomate in a position to acquire the desired line of credit. However, Mr. Kelley was cut out of the loop once the work for the line of credit had been substantially completed and was never paid any Bonus compensation whatsoever.

**c. <u>Equity Compensation</u>**

29. Mr Kelley was also promised "equity ownership in Fundomate Inc., and any of it's (sic.) subsidiaries, in a total amount of 5% of its equity, 25% of which will vest after 12 months of continuous service. The remaining 75% of equity granted will vest in equal quarterly increments over the next 24 months of continuous service." See Section 4 of the Offer Letter.

30. This Equity Compensation was believed by Mr. Kelley at the time he signed the Offer Letter to ultimately be the most valuable consideration for his employment. It was also the promise of the Equity Compensation that resulted in Mr. Kelley being coerced into signing the Addendum.

31. Based on the valuation offered in the Ulu Ventures term sheet (described below), as of November 2020 Fundomate had a valuation of at least $45 Million, for which Mr. Kelley would have been entitled to an equity stake of 5% had he continued to work as contemplated for three (3) years if Defendants had not frustrated his ability to obtain the benefits of his contract by wrongfully terminating him in November 2020.

**d. <u>Other Material Terms</u>**

32. During the course of the negotiations, Mr. Kelley also expressed to Mr. Schapiro that there were two "dealbreaker" terms that were indispensable to any employment agreement between he and Fundomate. These terms are each reflected in the Offer Letter.

33. <u>First</u>, he needed health insurance coverage for himself and his family. At the time, Fundomate did not provide health insurance to its employees, but Mr. Kelley

has a minor child with significant health issues which made health insurance an indispensable term of his employment. Mr. Schapiro agreed, promising health insurance benefits would be provided to Mr. Kelley by no later than August 4, 2020 (see also Section 3 of the Offer Letter). Because he was never provided health benefits as promised, Mr. Kelley was forced to continue to pay out of pocket for all medical expenses during his tenure with Fundomate, which amounted to many thousands of dollars across both medical and dental work for himself, his wife, and four children.

34. Second, where the COVID-19 pandemic was causing most persons to work from home to the extent their jobs allowed, Mr. Kelley required that he be permitted to work from his home in the Reno, Nevada area for the foreseeable future. Mr. Schapiro agreed in writing as set forth in Paragraph 1 of the Offer Letter ("You will report to Sam Schapiro, Chief Executive Officer, and be based in Reno NV. You have been approved to use your home as an office, and you will commute to the Fundomate offices as necessary for the first 9 months of employment.") Mr. Schapiro also agreed to provide Mr. Kelley with a home office setup that included a computer, printer, and phone, but never actually provided these items. As a result of Mr. Schapiro's dogged demands to work from Los Angeles instead of Reno, Nevada, Mr. Kelley was forced to lease an apartment in Beverly Hills, California that he paid for out of his own pocket. He was only reimbursed $1,000/month of the total $20,000 in travel and lodging expenses he incurred at the demand of his employer.

35. Finally, the Offer Letter stated in the second Paragraph of Section 8, "Within the first week of employment, the Company will provide additional information about the objectives and policies and general employment conditions, including a comprehensive employment agreement, which outlines additional employment terms, in accordance with the Company's policies." However, this purported "additional information" was never provided, nor was any "comprehensive employment agreement," nor any conveyance documents for the Equity Compensation. All of this demonstrates

Defendants' intent not to follow through with the promises made in the Offer Letter.

## III. **<u>Mr. Kelley Begins Work at Fundomate; Defendants Renege on Promises</u>**

36. Soon after starting work at Fundomate, Mr. Kelley began to have serious doubts as to Mr. Schapiro's character. It became clear that Mr. Schapiro had a habit of making promises – both orally and in writing – and then later reneging on those promises after Mr. Kelley had relied on them to his detriment. This includes, but is not limited to:

a. Unilaterally changing the compensation terms from the Offer Letter to the Addendum on Mr. Kelley's start date;

b. Failing to provide "Within the first week of employment… additional information about the objectives and policies and general employment conditions, including a comprehensive employment agreement, which outlines additional employment terms, in accordance with the Company's policies."

c. Failing to provide any conveyance documents for the Equity Compensation

d. Falling behind on paying his base salary, and paying him less than the already-reduced Addendum amount for the months of May-August 2020;

e. Failing to pay any portion of the Bonus for obtaining the warehouse line of credit;

f. Failing to provide any other Bonus terms as promised;

g. Failing to provide health insurance;

h. Requiring Mr. Kelley to work from Los Angeles after being promised he could work from Reno, Nevada;

i. Failing to provide any Paid Time Off as provided under the Offer Letter or pay out the accrued Paid Time Off at the conclusion of his employment.

37. Nevertheless, Mr. Kelley pressed on throughout the period from May to November 2020, diligently placing Fundomate in its desired position to raise capital. In

particular, Mr. Kelley leveraged an existing relationship with David Piotrowski, Managing Director at Waterford Capital, to search for and secure potential warehouse line of credit capital partners. Mr. Kelley also built a pitch deck, overhauled the financials, and developed the company mission statement and positioning, so as to put Fundomate in a favorable position with both Mr. Piotrowski, and numerous banks. As a result of Mr. Kelley's efforts, Fundomate had secured a number of Line of Credit term sheets for potential capital partners by the second half of 2020, including from Revere Bank, and Old Hill Partners, both for more than $25M each. Mr. Kelley also successfully engaged Ulu Venture Capital, where he had a strong relationship with a senior associate, Kevin Hoffberg. Based on Mr. Kelley's efforts, Ulu ended up issuing a term sheet to Fundomate for a venture investment.

## IV. Religious Discrimination and Harassment

38. Against the background of all of the above misrepresentations, broken promises, and bad faith actions, Mr. Schapiro also engaged in a severe and pervasive pattern of conduct of Religious Discrimination and Harassment against Mr. Kelley.

39. Mr. Schapiro holds himself out to be a devout Hasidic Jew. Mr. Kelley is a Christian, which fact was known to Mr. Schapiro who frequently discussed religion at work and made condescending remarks about Mr. Kelley's faith. The religious comments by Mr. Schapiro were made with such frequency that they created an overarching severe and pervasive hostile work environment based on Mr. Kelley's religion

40. Mr. Schapiro required his employees, including Mr. Kelley, to follow his personal religious observations, including not working during the Jewish Sabbath from sundown on Fridays to sundown on Saturdays. Mr. Schapiro, in fact, often chastised Mr. Kelley for doing any work – including work unrelated to Fundomate – during the Jewish Sabbath. He also required that employees – including Mr. Kelley – only eat Kosher food in the office.

41. Where Mr. Kelley observed the Christian Sabbath on Sundays, Mr. Schapiro

would often require Mr. Kelley to work and would set meetings and calls on Sunday in what appeared to be a conscious effort to spite Mr. Kelley because of his religious beliefs.

42. Upon hiring Mr. Kelley, Mr. Schapiro commented to Mr. Kelley that he "thinks he could make him a Jew."

43. Mr. Schapiro also on several occasions made reference to Mr. Kelley needing to have a bar mitzvah, and in at least two very specific occasions, stated Mr. Kelley needed to do so before he would be paid any Bonus monies.

44. For example, in a text exchange on July 8, 2020, Mr. Schapiro told Mr. Kelley "when we close the round [of financing] God willing we do tifflin." Mr. Kelley replied, "What is tifflin?" to which Mr. Schapiro replied "Google it. It's the act that defines a bar mitzvah… I think if we agree it would give us tremendous blessings."

45. Finally, in firing Mr. Kelley on November 17, 2020, Mr. Schapiro told him, "It's probably better not having a Christian here since you never got a bar mitzvah."

**V. <u>Mr. Kelley Successfully Secures Capital Partners but is Denied Promised Compensation</u>**

46. On September 17, 2020 (12:08pm), Mr. Kelley wrote to Mr. Schapiro "now that the bank NDAs are signed, and given the agreement with David Piotrowski has been in place… I'd like to ensure you agree to my additional bonus payout once the bank LOC [Line of credit] closes of 1.5% x LOC amount, assuming over $25M.

47. Mr. Schapiro responded on September 17, 2020 (2:23pm), "As long as you sourced the directly, or through agreement with Dave P., then yes agreed. I expect you to do Tefillin with me, and you need to have a Bar Mitzvah."

48. This September 17, 2020 exchange made unmistakably clear two things: (1) Mr. Schapiro agreed to pay 1.5% of the line of credit to Mr. Kelley as a bonus, and (2) the payment of that bonus was being conditioned on Mr. Kelley performing certain Jewish religious acts. A true and correct copy of a screenshot of this email exchange is

attached hereto and incorporated by reference as **Exhibit C**.

## VI. Wrongful Termination to Avoid Payment of Bonus or Equity Compensation

49. It is the fundamental public policy of the State of California that employers may not terminate an employee to avoid paying wages or compensation due or in retaliation for demanding wages due. See, e.g., Gould v. Maryland Sound Indus., Inc., 31 Cal. App. 4th 1137, 1146-1150, as modified (Feb. 9, 1995).

50. As Mr. Kelley continued to work into the Fall of 2020 for Fundomate's benefit, he continued to demand that the Bonus terms be finalized and put into writing. He finally wrote up his own self determined Objectives in a detailed documented dated November 1, 2020 that he provided to Mr Schapiro in printed form in his office, and via email.

51. As stated above, Mr Kelley had also secured a term sheet for ULU Ventures, to lead a round of funding based on a $45M valuation, but this deal fell through because of Mr Schapiro's unwillingness to negotiate fairly with ULU, and his desire to be paid personally a significant amount of capital from the investment (which concerned the Partners at ULU). Notwithstanding the ULU deal falling through because of its misgivings about Mr. Schapiro's business practices, Fundomate still had open and viable Line of Credit term sheets with Revere Bank and Old Hill Partners, both for more than $25M each, as of November 17, 2020.

52. However, despite the success of Mr. Kelley in his efforts to secure desired capital partners for Fundomate, instead of compensating Mr. Kelley as promised for his successes, Mr. Schapiro devoted his energies to cutting Mr. Kelley out of the loop in November 2020.

53. On or about November 13, 2020, Mr. Schapiro confirmed in a Whatsapp chat with Mr. Baraket that he had reached out to Mr. Piotrowski to confirm he could still secure a line of credit if he fired Mr. Kelley ("Dave line of credit with or with out Glen").

He further confirmed he set up a direct meeting with Rahul Gupta to discuss the offers from Revere Bank and Old Hill Partners. Mr. Gupta was the former President of Fiserv, and was an extremely well-respected executive in this space, who had been an mentor of Mr. Kelley's for years and who was brought to Fundomate by Mr. Kelley to serve as an advisor. All of these actions were intended to take Mr. Kelley's work and connections, and secure the line of credit while cutting Mr. Kelley out of the deal and not paying him for his work.

54. Then on November 17, 2020, Mr. Kelley was informed he was fired. At no point was he ever paid the salary he originally agreed to in the Offer Letter, nor any part of the Bonus or Equity Compensation. Rather, having usurped Mr. Kelley's relationship with Mr. Piotrowski, using the pitch deck and financials prepared by Mr. Kelley, and being well on the way to acquiring the desired warehouse line of credit, Mr. Schapiro decided to fire Mr. Kelley instead of making good on any of the promises made during their original negotiations or as set forth in the Offer Letter.

55. Thereafter, Fundomate did in fact close a $50 Million line of credit with Revere Capital (the firm Mr Kelley had sourced, and from which he had received a term sheet from before he was fired). Fundomate actually admitted in the press release at the time the line of credit was procured through Mr. Piotrowski at Waterford Capital. On information and belief, this line of credit would not have been obtained but for the efforts and relationships of Mr. Kelley prior to his termination, and would have resulted in compensation owed to Mr. Kelley had Defendants not frustrated the agreement first by terminating him after the required work had been substantially completed. Mr. Kelley is therefore entitled to the agreed upon bonus compensation – 1.5% of the line of credit obtained, or **$750,000.00.**

## FIRST CAUSE OF ACTION

**[Breach of Written Contract/Unpaid Wages – Against Defendants Fundomate, Inc. and Fundomate, LLC]**

56. Plaintiff restates and incorporates herein by reference each and every allegation contained in paragraphs 1 through 55, inclusive, above.

57. Plaintiff was employed by Fundomate from May 11, 2020 to November 18, 2020 as its President and Chief Operating Officer.

58. The terms of his employment were set forth in the Offer Letter, as attached hereto as **Exhibit A**, and as supplemented by the agreement to pay bonus monies based on closing the warehouse line of credit as set forth in **Exhibit C**.

59. On May 11, 2020, when Plaintiff was set to begin work under the Offer Letter, Defendants unilaterally changed the terms of his initial six (6) months of employment from May 11, 2020 through November 10, 2020. The unilateral reformation, which was only agreed to under duress, is set forth at **Exhibit B**.

60. During the course of his employment, Defendants breached the Offer Letter in several respects, including, but not limited to:

a. Changing the compensation terms from the Offer Letter to the Addendum on Mr. Kelley's start date;

b. Failing to provide "Within the first week of employment… additional information about the objectives and policies and general employment conditions, including a comprehensive employment agreement, which outlines additional employment terms, in accordance with the Company's policies."

c. Failing to provide any conveyance documents for the Equity Compensation

d. Falling behind on paying his base salary, and paying him less than the already-reduced Addendum amount for the months of May-August 2020;

e. Failing to provide any Bonus Compensation terms as promised;

f. Failing to provide health insurance; and

g. Requiring Mr. Kelley to work from Los Angeles after being promised he could work from Reno, Nevada

h. Failing to fully reimburse Mr. Kelley for his travel and lodging in Los Angeles; and

i. Frustrating his ability to obtain the benefits of the Equity Compensation

61. Where Defendants expressly promised to pay Mr. Kelley bonus wages of 1.5% of the warehouse line of credit, and where Defendants did secure a $50 Million line of credit based on Mr. Kelley's work and his relationship with Mr. Piotrowski, Defendants have failed to pay Mr. Kelley **$750,000.00** in bonus wages.

62. Where Defendants promised to pay Mr. Kelley a target bonus of $350,000, then failed to provide the parameters as promised in good faith, Defendants have failed to pay Mr. Kelley **$175,000.00** in Bonus Compensation.

63. Where the Addendum was only procured through fraud and duress, Plaintiff is entitled to the full amount of wages he was owed as Base Salary under the Offer Letter for the period of March 11, 2020 to November 18, 2020. This amount is calculated as $175,000 - $93,750 = **$81,250.00** in Base Salary.

64. Based on the valuation offered in the Ulu Ventures term sheet (described below), as of November 2020 Fundomate had a valuation of at least $45 Million, for which Mr. Kelley would have been entitled to an equity stake of 5% had he continued to work as contemplated for three (3) years if Defendants had not frustrated his ability to obtain the benefits of his contract by wrongfully terminating him in November 2020. On information and belief, the value of the Equity Compensation has increased since November 2020, and Plaintiff seeks such compensation in an amount according to proof at trial.

65. Finally, even assuming *arguendo* the Addendum was effective, Defendants' breached the combined terms of the Offer Letter and Addendum by failing to pay Mr. Kelley all wages owed for the week of November 11, 2020 to November 18, 2020. By its own terms, the Addendum expired on November 10, 2020, and therefore Mr. Kelley was owed $6,370.77 for one week of work at $350,000.00 per annum under the Offer

Letter. Mr. Kelley was not paid the entire amount owed for November 2020, but rather was paid $4,687.49 for the period from November 1 through November 18 – how this amount was reached by Defendants is unclear, but it appears to be derived from the secondary unilateral reduction to $8,333.34/month. In any event, Mr. Kelley's total base salary pay for November 2020, without waiver and only assuming *arguendo* that the Addendum was valid, should have been $5,208.33 + $6,370.77 = 11,579.10, thereby leaving Mr. Kelley underpaid by $6,891.61 at the time of his termination.

66. Defendants' failure to comply with the terms of the Offer Letter has not been excused or waived.

67. Plaintiff has suffered further resultant harm caused by Defendants' breach of the Offer Letter. This harm includes, but is not limited to out of pocket costs incurred for travel and lodging because of Defendants' breach of the agreement to allow Mr. Kelley to work from home, and out of pocket costs for health care because of Defendants' breach of the agreement to provide health insurance.

68. As a result of Defendants' illegal conduct, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits, has incurred attorneys' fees and medical bills, all to his damage in excess of the minimum jurisdiction of this court, the precise amount to be proved at the time of trial. Plaintiff claims such amount as damages together with prejudgment interest pursuant to Labor Code Section 218.6, Civil Code Section 3289 and/or any other provision of law providing for pre-judgment interest.

69. Plaintiff is entitled to recover attorneys' fees and costs in connection with the nonpayment of wages pursuant to Cal. Labor Code sec. 218.5.

## SECOND CAUSE OF ACTION

### [Fraudulent Inducement – Against All Defendants]

70. Plaintiff restates and incorporates herein by reference each and every allegation contained in paragraphs 1 through 69, inclusive, above.

71. Mr. Schapiro promised Plaintiff certain terms to induce him into accepting employment with Fundomate, which terms were never performed. These terms, as memorialized in **Exhibits A and C** include, but are not limited to:

a. Changing the compensation terms from the Offer Letter to the Addendum on Mr. Kelley's start date;

b. Failing to provide "Within the first week of employment… additional information about the objectives and policies and general employment conditions, including a comprehensive employment agreement, which outlines additional employment terms, in accordance with the Company's policies."

c. Failing to provide any conveyance documents for the Equity Compensation

d. Falling behind on paying his base salary, and paying him less than the already-reduced Addendum amount for the months of May-August 2020;

e. Failing to provide any Bonus Compensation terms as promised;

f. Failing to provide health insurance;

g. Requiring Mr. Kelley to work from Los Angeles after being promised he could work from Reno, Nevada; and

h. Failing to provide any bonus compensation for Mr. Kelley's work in securing the warehouse line of credit.

72. As evidenced by Defendants' conduct, Defendants never intended to perform on these terms in the Offer Letter or Exhibit C. There is no reasonable or good faith grounds for denying Plaintiff the compensation to which he was entitled.

73. Moreover, on information and belief, Defendants have a lengthy history of not performing on others' contracts under substantially similar conditions, such that Defendants' actions in this matter are part of a common plan or scheme where Defendants routinely stiff persons without excuse or justification for labor performed after obtaining the benefits of their labor.

74. Mr. Schapiro intended for Mr. Kelley to rely on his representation in accepting employment and performing work for Fundomate.

75. Mr. Kelley did in fact rely on Defendants' representations in agreeing to his detriment to accept the President/COO role and forego other viable employment opportunities.

76. Plaintiff was harmed by Defendants when his employment was terminated following a clear and unmistakable series of actions evincing an intent by Defendants not to honor their agreements. Such harm includes, but is not limited to, loss of income, loss of equity compensation, loss of future earning potential, loss of reputation, emotional distress, and out-of-pocket costs and attorneys' fees. Plaintiff claims such amount as damages together with prejudgment interest pursuant to California Civil Code Section 3287 and/or any other provision of law providing for pre-judgment interest.

77. Plaintiff's reliance on Defendants' representations was a substantial factor in causing his harm.

78. Any representations described above by Mr. Schapiro were authorized and ratified by the Fundomate, and vice-versa. Defendants, in performing the acts alleged above, acted with a conscious disregard of Plaintiff's rights, and with the intent to vex, injure and annoy Plaintiff; such as to constitute oppression, fraud or malice under California Civil Code § 3294 thereby entitling Plaintiff to exemplary or punitive damages.

## THIRD CAUSE OF ACTION

## [FEHA Religious Discrimination in Employment – against Defendants Fundomate, Inc. and Fundomate, LLC]

79. Plaintiff restates and incorporates herein by reference each and every allegation contained in paragraphs 1 through 78, inclusive, above.

80. California Gov. Code Section 12940(a) prohibits employers or any other person from discriminating against an employee on the basis of religion.

81. Defendants Fundomate, Inc. and Fundomate, LLC are an employer under the FEHA, and Plaintiff was an employee of Defendant whose religion is Christian. At all relevant times, Plaintiff's religion was known to Defendant.

82. Fundomate, by and through Mr. Schapiro, expressed an open favoritism to the Jewish religion (and disdain for Christianity) by its words and conduct throughout Plaintiff's employment;

83. Plaintiff suffered adverse employment actions, including being: (1) demanded to participate in Jewish religious acts as a term of his employment; (2) forced to observe the Jewish Sabbath while being forced to work on the Christian Sabbath; (3) forced to undergo a bar mitzvah in order to obtain his Bonus Compensation; (4) being involuntarily terminated; and (5) being told by Mr. Schapiro at the time of his termination that "It's probably better not having a Christian here since you never got a bar mitzvah."

84. As a proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer harm, including substantial and ongoing pecuniary losses, all to his damage in excess of the minimum jurisdiction of this court, the precise amount to be proved at the time of trial. Plaintiff claims such amount as damages together with prejudgment interest pursuant to Civil Code Section 3287 and/or any other provision of law providing for pre-judgment interest.

85. As a proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer substantial anxiety, humiliation, mental anguish, embarrassment, worry, sleeplessness, mental and emotional distress, loss of reputation, and other incidental damages and out-of-pocket expenses, all to Plaintiff's general damage in excess of the minimum jurisdiction of this court, with the precise amount to be proved at the time of trial.

86. As a proximate result of Defendants' conduct, Plaintiff has incurred attorneys' fees and costs, all to his damage in excess of the minimum jurisdiction of this

court, the precise amount to be proved at the time of trial. Plaintiff claims such amount as damages together with prejudgment interest pursuant to Civil Code Section 3287 and/or any other provision of law providing for pre-judgment interest.

87. Defendants, in performing the acts alleged above, acted with a conscious disregard of Plaintiff's rights, and with the intent to vex, injure and annoy Plaintiff, such as to constitute oppression, fraud or malice under California Civil Code § 3294, thereby entitling Plaintiff to exemplary or punitive damages.

## FOURTH CAUSE OF ACTION

**[FEHA Religious Harassment in Employment – Against All Defendants]**

88. Plaintiff restates and incorporates herein by reference each and every allegation contained in paragraphs 1 through 87, inclusive, above.

89. California Gov. Code Section 12940(j) prohibits employers or any other person from harassing an employee on the basis of religion.

90. Defendants created a hostile work environment and subjected Plaintiff to unwanted harassment on the basis of his religion, which included being: (1) demanded to participate in Jewish religious acts as a term of his employment; (2) forced to observe the Jewish Sabbath while being forced to work on the Christian Sabbath; (3) forced to undergo a bar mitzvah in order to obtain his Bonus Compensation; (4) involuntarily terminated; and (5) being subjected to negative comments about Christianity, including being told at the time of his termination "It's probably better not having a Christian here since you never got a bar mitzvah."

91. Such harassing conduct was severe and/or pervasive such that it materially altered the conditions of Mr. Kelley's employment.

92. As a proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer harm, including substantial and ongoing pecuniary losses, all to his damage in excess of the minimum jurisdiction of this court, the precise amount to be proved at the time of trial. Plaintiff claims such amount as damages together with

prejudgment interest pursuant to Civil Code Section 3287 and/or any other provision of law providing for pre-judgment interest.

93. As a proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer substantial anxiety, humiliation, mental anguish, embarrassment, worry, sleeplessness, mental and emotional distress, loss of reputation, and other incidental damages and out-of-pocket expenses, all to Plaintiff's general damage in excess of the minimum jurisdiction of this court, with the precise amount to be proved at the time of trial.

94. As a proximate result of Defendants' conduct, Plaintiff has incurred attorneys' fees and costs, all to his damage in excess of the minimum jurisdiction of this court, the precise amount to be proved at the time of trial. Plaintiff claims such amount as damages together with prejudgment interest pursuant to Civil Code Section 3287 and/or any other provision of law providing for pre-judgment interest.

95. Defendants, in performing the acts alleged above, acted with a conscious disregard of Plaintiff's rights, and with the intent to vex, injure and annoy Plaintiff, such as to constitute oppression, fraud or malice under California Civil Code § 3294, thereby entitling Plaintiff to exemplary or punitive damages.

## FIFTH CAUSE OF ACTION

**[Wrongful Termination in Violation of Public Policy – Against Defendants Fundomate, Inc. and Fundomate, LLC]**

96. Plaintiff restates and incorporates herein by reference each and every allegation contained in paragraphs 1 through 95, inclusive, above.

97. Fundomate employed Plaintiff and terminated his employment on or about November 18, 2020.

98. It is the fundamental public policy of the State of California that employers may not terminate an employee to avoid paying wages due. See, e.g., Gould v. Maryland Sound Indus., Inc., 31 Cal. App. 4th 1137, 1146-1150, as modified (Feb. 9,

1995).

99. It is also the fundamental public policy of the State of California that employers may not terminate an employee for discriminatory reasons based on religion.

100. Fundomate willingly, knowingly and intentionally violated public policy when it terminated Plaintiff as described above.

101. As a proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer harm, including substantial and ongoing pecuniary losses, all to his damage in excess of the minimum jurisdiction of this court, the precise amount to be proved at the time of trial. Plaintiff claims such amount as damages together with prejudgment interest pursuant to Civil Code Section 3287 and/or any other provision of law providing for pre-judgment interest.

102. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer substantial anxiety, mental anguish, worry, sleeplessness, mental and emotional distress, loss of reputation, and other incidental damages and out-of-pocket expenses, all to Plaintiff's general damage in excess of the minimum jurisdiction of this court, with the precise amount to be proved at the time of trial.

103. Defendants, in performing the acts alleged above, acted with a conscious disregard of Plaintiff's rights, and with the intent to vex, injure and annoy Plaintiff, such as to constitute oppression, fraud or malice under California Civil Code § 3294, thereby entitling Plaintiff to exemplary or punitive damages.

## SIXTH CAUSE OF ACTION

**[FEHA Failure to Prevent Discrimination and Harassment – against Defendants Fundomate, Inc. and Fundomate, LLC]**

104. Plaintiff restates and incorporates herein by reference each and every allegation contained in paragraphs 1 through 103, inclusive, above.

105. Plaintiff was subjected to discrimination and harassment due to his religion in the course of his employment with Fundomate.

106. Employers are required under the FEHA to take all reasonable steps to prevent discrimination and harassment, and where the employer knows or should have known of the conduct, it must take immediate and appropriate corrective action.

107. Defendant knew or should have known that Plaintiff was being subjected to illegal discrimination and harassment and should have taken all reasonable steps to investigate and take immediate and appropriate corrective action.

108. Defendant at all relevant times failed to prevent such illegal conduct or take immediate and appropriate corrective action.

109. As a proximate result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial losses in earnings and other employment benefits, has incurred attorneys' fees and costs, all to his damage in excess of the minimum jurisdiction of this court, the precise amount to be proved at the time of trial. Plaintiff claims such amount as damages together with prejudgment interest pursuant to Civil Code Section 3287 and/or any other provision of law providing for pre-judgment interest.

110. As a result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial anxiety, humiliation, mental anguish, embarrassment, worry, sleeplessness, mental and emotional distress, loss of reputation, and other incidental damages and out-of-pocket expenses, all to Plaintiff's general damage in excess of the minimum jurisdiction of this court, with the precise amount to be proved at the time of trial.

111. As a proximate result of Defendants' conduct, Plaintiff has incurred attorneys' fees and costs, all to his damage in excess of the minimum jurisdiction of this court, the precise amount to be proved at the time of trial. Plaintiff claims such amount as damages together with prejudgment interest pursuant to Civil Code Section 3287 and/or any other provision of law providing for pre-judgment interest.

112. Defendants, in performing the acts alleged above, acted with a conscious

disregard of Plaintiff's rights, and with the intent to vex, injure and annoy Plaintiff, such as to constitute oppression, fraud or malice under California Civil Code § 3294, thereby entitling Plaintiff to exemplary or punitive damages.

## SEVENTH CAUSE OF ACTION

**[Violation of Cal. Labor Code § 2802 – Against Defendants Fundomate, Inc. and Fundomate, LLC]**

113. Plaintiff restates and incorporates herein by reference each and every allegation contained in paragraphs 1 through 110, inclusive, above.

114. Cal. Labor Code § 2802 states, *inter alia*, "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer…"

115. Despite the language of the Offer Letter promising to permit Plaintiff to work from his home in Reno, Nevada, upon beginning his employment at Fundomate, he was directed to appear in person at Fundomate's offices in the Los Angeles area with such frequency that he ended up renting an apartment in Beverly Hills at an out of pocket cost of $1870/month. Additionally, because the work took place during the initial months of the COVID-19 pandemic, Plaintiff was forced to travel using his personal vehicle between Reno and Los Angeles on a bi-weekly basis.

116. Mr. Kelley was never reimbursed more than $1,000 a month for his necessary expenditures incurred in direct consequence of the discharge of his duties, which totaled approximately $20,000 during his period of employment.

117. Plaintiff seeks to recover by way of this Action in an amount according to proof for all unreimbursed necessary expenditures incurred in direct consequence of the discharge of his duties, which outstanding amount is presently estimated to be $14,000.

118. Pursuant to Labor Code § 2802(c), Plaintiff also seeks to recover all attorneys' fees incurred in the enforcement of these rights.

## EIGHTH CAUSE OF ACTION

**[Waiting Time Penalties (Cal. Labor Code § 203) – Against Defendants Fundomate, Inc. and Fundomate, LLC]**

119. Plaintiff restates and incorporates herein by reference each and every allegation contained in paragraphs 1 through 118, inclusive, above.

120. Cal. Lab. Code section 203 provides: "(a) If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

121. Plaintiff's employment with Fundomate was terminated on or about November 18, 2020. At that time, Fundomate willfully failed to pay Plaintiff all wages owed upon termination, including, but not limited to, the entire Base Salary to which he was entitled under the Offer Letter for November 2020.

122. Fundomate additionally failed to pay Mr. Kelley out any portion of the Paid Time Off he had accrued under Section 3 of the Offer Letter at the time of his termination.

123. Fundomate is therefore liable to Plaintiff for statutory and civil waiting time penalties of up to 30 days continuing wages pursuant to Labor Code § 203 and other applicable laws and regulations, along with attorneys' fees and costs incurred.

124. The total amount of waiting time penalties is calculated as $350,000/2080 hours * 8hr/day * 30 days = **$40,384.62.**

## DEMAND FOR JURY TRIAL

Plaintiff Glen Kelley hereby demands a jury trial in this matter.

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them, as follows:

1. General damages in excess of $75,000.00 according to proof;
2. Relief for lost Equity Compensation based on a valuation in an amount according to proof at trial;
3. Special damages for lost income, medical expenses and other out of pocket expenses in an amount according to proof;
4. Punitive or exemplary damages;
5. Reimbursement of expenses incurred at the direction of his employer;
6. Waiting time penalties of $40,384.62 under Labor Code sec. 203;
7. Reasonable attorney fees in an amount according to proof;
8. Pre-judgment interest;
9. Costs of suit;
10. Such other and further relief as the court may deem proper.

Respectfully submitted,

DATED: August 20, 2022 LAZARSKI LAW PRACTICE, P.C.

By ______________________________

Bryan J. Lazarski
Attorney for Plaintiff Glen Kelley

# Exhibit A

April 29, 2020

Glen Kelley
kelley_glen@yahoo.com

RE: Employment Offer from Fundomate

Dear Glen Kelley,

Per our conversation, Fundomate, Inc., a California Corporation (the "Company"), is pleased to offer you employment on the following terms:

1. **Position.** Your initial title will be **President & Chief Operating Officer,** and this is a full-time, **Exempt**, position. By signing this letter agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from performing your duties for the Company. Your target start date is **Monday, May 11, 2020.** You will report to Sam Schapiro, Chief Executive Officer, and be based in **Reno NV.** You have been approved to use your home as an office, and you will commute to the Fundomate offices as necessary for the first 9 months of employment. After the first 9 months of employment, the Company may require that the position change to be based in Los Angeles, CA at its Headquarters location.

2. **Duties.** Employee's specific employment duties, without limitation, shall include:

> review current partners in the Company portfolio and propose and execute strategies to maximize the portfolio's performance including increasing portfolio size and revenue
> review and analyze the Company's advance/lending deals, and work to increase the portfolio
> review the Company's capital sources, and positions and work to improve those
> meet with new partners to discuss partnerships
> review the organization staffing, model and operations/HR functions and work to establish organization plans and growth
> discuss and meet with current investors, in partnership with CEO, and introduce CEO to new investors
> work on preparing company for a Seed/Series A round of funding, including working with the leadership team on preparing a pitch deck/business plan, a financial forecast and projection over 3 and 5 years, and an overall investment strategy for the growth of the business
> other functions commensurate with role of President & Chief Operating Officer

2. **Cash Compensation.** In consideration for rendering services to the Company during the term of your employment and fulfilling your obligations under this Agreement, you will be eligible to receive the benefits set forth in the Agreement.

a. Base Salary. In this exempt full-time position, you will earn an annual base salary of **$350,000.00 ($29,167 per month)** (prorated for any partial period that occurs during the term of your employment), subject to applicable tax withholdings. Your salary will be payable pursuant to the Company's regular payroll policy.

b. Performance Bonus. In addition to your base salary, you will be eligible to earn a target annual bonus amount equal to **100% of Base Salary,** as an employee of the Company and in good standing at all times up to and including the date of a bonus payment, subject to the terms of this Agreement and terms and conditions of any Company bonus plan and policy. Objectives for earning the Performance Bonus, will be set by the CEO, and will be discussed, developed and distributed before year-end for the calendar year and reporting period, and is payable in Q1 2021.

3. **Employee Benefits.** Employee shall be eligible to receive and to participate in programs for fringe benefits as the Company may make available generally to its employees from time to time during the Employment Term. This includes enjoying all Federal Holidays as Paid Time Off (PTO), as well as 2 weeks of PTO in each calendar year. Employee shall be responsible for making any generally applicable employee contributions required under such fringe benefit programs. The Benefits shall be available to Employee within 90 days of employment (no later than August 4, 2020).

4. **Equity Compensation.** You will be granted equity ownership in Fundomate Inc., and any of it's subsidiaries, in a total amount of 5% of its equity, 25% of which will vest after 12 months of continuous service. The remaining 75% of equity granted will vest in equal quarterly increments over the next 24 months of continuous service.

In addition, if the Company is subject to a Change in Control before the termination of your continuous service with the Company, **and anytime after 18 months from your start date of May 11, 2020**, and you are subject to a Termination Without Cause, or Resignation with Cause anytime after such Change in Control, then 100% of the then unvested equity shall vest. A Resignation with Cause is defined as a base salary reduction of more than 10%.

"Cause" means (a) your unauthorized disclosure of the Company's confidential information of trade secrets, which use or disclosure causes material harm to the Company, (b) your material breach of any agreement between you and the Company, (c) your material failure to comply with the Company's written policies or rules, (d) your conviction of, or your please of "guilty" or "no contest" to, a felony under the laws of the United States or any State, (e) your gross negligence of willful misconduct, (f) your continuing failure to perform assigned duties after receiving written notification of the failure from the Company's Board of Directors or (g) your failure to cooperate in good faith with a government or internal investigation of the Company or its officers or employees, if the Company requests your cooperation.

"Change in Control" means (a) the consummation of a merger or consolidation of the Company with or into another entity or (b) the dissolution, liquidation or winding up of the Company.

"Termination Without Cause" means a separation as a result of a termination of your employment by the Company without Cause, provided you are willing and able to continue performing services within the meaning of Treasury Regulation 1.409A-1(n)(1).

5. **Employment Relationship.** Employment with the Company is for now specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with our without case. Any contrary representations that may have been made to you are superseded by this letter agreement. This is the full and complete agreement between you and the Company on this term, although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the

"at will" nature of your employment may only be changed in an express written agreement signed by you and a duly authorized officer of the Company (other than you).

6. **Severance.** After the first year of employment, beginning on **May 12, 2021,** If your employment with the Company is terminated by the Company without "Cause" (as defined herein), (i) you will be eligible to receive a severance payment equal to four (4) months of your then current base salary excluding bonuses and other compensations ("Severance Amount"). The foregoing severance package shall be conditioned on you executing and not revoking a valid release of claims and separation agreement, in a form prescribed by the Company. The Severance Amount shall be paid in four monthly installments, after Company's receipt of a signed release/separation Agreement from you; provided that, all your severance benefits are and shall remain subject to Section 4 above notwithstanding any terms to the contrary.

7. **Withholding Taxes.** All forms of compensation referred to in the letter agreement are subject to reduction to reflect applicable withholding and payroll taxes and other deductions required by law.

8. **Entire Agreement.** This letter agreement supersedes and replaces any prior agreement, representations or understandings, whether written, oral or implied, between you and the Company.

Within the first week of employment, the Company will provide additional information about the objectives and policies and general employment conditions, including a comprehensive employment agreement, which outlines additional employment terms, in accordance with the Company's policies.

Fundomate, Inc., conditions this offer upon your providing appropriate documentation of United States citizenship or authorization to work in the United States.

To indicate your acceptance of this offer, please sign and date this letter and return it to me. This offer will expire by **April 30, 2020 at 11:59 p.m. PST.**

Very truly yours,

DocuSigned by:
Sam Schapiro
F23B349FEB0E466...

4/29/2020

Sam Schapiro
Founder & CEO
Fundomate, Inc.

I have read and accept this employment offer:

DocuSigned by:
Glen M. Kelley
CD0C6956271140D...

Name: Glen Kelley
Date: 4/30/2020

# Exhibit B

May 11, 2020

Glen Kelley
kelley_glen@yahoo.com

RE: Addendum to Employment Offer from Fundomate

Dear Glen Kelley,

Per our conversation, Fundomate, a California Limited Liability Partnership (the "Company"), is making the following adjustment to your Employment Offer:

1. **Cash Compensation.**

a. Adjusted Base Salary. For the first 6 months of your employment with Fundomate from your start date of May 11, 2020, through November 10, 2020, you agree to accept a reduction of your Base Salary equivalent to an actual monthly gross payment of **$15,625**, subject to applicable tax withholdings. Your salary will be payable pursuant to the Company's regular payroll policy. If the Company achieves certain milestones or funding during your first 6 months of employment, or other outstanding milestones, it may decide to accelerate your Adjusted Base Salary to be in line with your Base Salary as noted in your Employment Offer.

b. Guarantee of Adjusted Base Salary for first 6 months. Your Adjusted Base Salary is guaranteed for the first 6 months of your employment with Fundomate from your start date of May 11, 2020, through November 3, 2020, as long as you do not choose to leave the company during that time. If for any other reason the Company decides to part ways with you, and/or the Company chooses to terminate your employment with the Company, you will be paid the balance of the Adjusted Base Salary due you monthly, through November 10, 2020 at the rate noted above under Adjusted Base Salary. This in essence means that $15,625 times 6 months, or **$93,750**, is guaranteed to you in every circumstance, unless you decide to resign during that time.

c. For the first year of employment with the Company, you are only eligible for a **Per formance Bonus** at a prorated amount per your Employment Offer, for the second 6 months of your tenure with the Company. If the Company achieves certain mile stones or funding during your first 6 months of employment, or other outstanding milestones, it may decide to also reward you with a Performance Bonus for all or a portion of your first 6 months of employment.

3. **Personal Commuting Expense.** For the first 6 months of your employment, from May 11, 2020, to November 10, 2020, you will be reimbursed a gross amount of up to $1,000 per month, for your personal travel expenses to Los Angeles, CA, from Reno, NV, as a way to assist with your travel into the Com-

pany's Headquarters. This will be paid as you submit receipts for your personal commuting costs including hotel, airfare, mileage, parking, or gas etc, monthly - up to the $1,000 gross level per month, for 6 months.

Please note, per our discussions, it is our intention to discuss and review your performance on or before November 10, 2020, and assuming you are meeting expectations, we intend to keep you in the role you are in, and continue all other terms under the Employment Offer, dated April 29, 2020. This includes the Company making best efforts to make you whole on your Base Salary and other compensation elements in the **Employment Offer dated April 29, 2020.** As part of that, the Company will from November 11, 2020, to May 10, 2021, add a prorated amount above your normal **Base Salary (which is $29,167 per month)**, in equal monthly increments. The amount added monthly will be between 25% (additional $14,583 per month) to 75% of the month balanced owed, depending on market conditions. It is our plan to make best efforts to make you whole on your Base Salary for year 1 of $350,000, and if more time is needed to do so and you are to whole by the end of your first year, we will make up any remaining gap up in your second year of employment, which would begin May 11, 2021.

This letter agreement is an amendment to your prior agreement, between you and the Company, titled "Employment Offer from Fundomate," dated, April 29, 2020. To indicate your acceptance of this offer, please sign and date this letter and return it to me.

Very truly yours,

DocuSigned by:
Sam Schapiro
F23B349FEB0E466...

4/29/2020

Sam Schapiro
Founder & CEO
Fundomate, Inc.

I have read and accept this addendum to my **Employment Offer, dated April 29, 2020**.

DocuSigned by:
Glen M. Kelley
CD0C6956271140D...

Name: Glen Kelley
Date: 4/30/2020

# Exhibit C

**Sam Schapiro** <sam@fundomate.com>
To: Glen Kelley, Glen Kelley

Thu, Sep 17, 2020 at 2:23 PM

As long as you sourced the deal directly, or through our agreement with Dave P, then yes agreed. I expect you to do Tefillin with me, and you need to have a Bar Mitzvah.

***Sam Schapiro***
***Founder and CEO***
***O: 310-734-5955 x 318***
***C. 347-977-0145***
www.fundomate.com

fundomate

Check out our **450** reviews

Trustpilot

**CONFIDENTIALITY NOTICE:** This electronic communication, and all information herein, including files attached hereto, is private and is the property of the sender. This communication is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure of; dissemination of; distribution of; copying of; or, taking any action in reliance upon this communication, is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, 310-734-5955, or email admin@fundomate.com AND DESTROY THE ORIGINAL AND ALL COPIES OF THIS COMMUNICATION. Thank you.

On Thu, Sep 17, 2020, 12:08 PM Glen Kelley <glen@fundomate.com> wrote:

> now that the bank NDAs are signed, and given the agreement with David Piotrowski has been in place…
>
> i'd like to ensure you agree to my additional bonus payout once the bank LOC closes of 1.5% x LOC amount, assuming over $25M