1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA
10

11   GLEN KELLEY,                          Case No. 2:22-cv-05814-FLA (ASx)

12                        Plaintiff,        **MEMORANDUM OF DECISION**
                                            **FOLLOWING BENCH TRIAL**
13          v.

14   FUNDOMATE, INC., *et al.*,

15                        Defendants.

16
17
18
19
20
21
22
23
24
25
26
27
28

1

## RULING

2   Plaintiff Glen Kelley ("Plaintiff") brings this action against Defendants

3   Fundomate, Inc. ("Fundomate" or the "Company"), Fundomate, LLC, and Sam

4   Schapiro ("Schapiro") (collectively, "Defendants") for: (1) breach of written contract;

5   (2) fraudulent inducement; (3) religious discrimination in employment in violation of

6   the Fair Employment and Housing Act ("FEHA"; Cal. Gov't Code § 12900, *et seq.*);

7   (4) religious harassment in employment in violation of FEHA; (5) failure to prevent

8   discrimination and harassment in violation of FEHA; (6) wrongful termination in

9   violation of public policy; and (7) waiting time penalties in violation of Cal. Lab.

10  Code § 203.

11  The court held a bench trial on October 30–31, 2024.  Dkt. 115 (October 30,

12  2024 Transcript, "Day 1 Tr."); Dkt. 116 (October 31, 2024 Transcript, "Day 2 Tr.").

13  On November 15, 2024, the parties filed post-trial briefs regarding the admissibility of

14  Trial Exhibit 28.  Dkts. 111, 112.  On January 17, 2025, the parties filed proposed

15  findings of fact and conclusions of law.  Dkts. 119 ("Defs.' Mem."), 123 ("Pl.'s

16  Mem.").

17  After considering and weighing the evidence presented and evaluating the

18  witnesses' credibility at trial, the court:

19
20  - FINDS Fundomate, LLC not liable on every claim;

21  - FINDS Fundomate liable for breach of written contract and AWARDS
    Plaintiff $5,048.08 in economic damages;

22
23  - FINDS Schapiro and Fundomate liable for fraudulent inducement and
    AWARDS Plaintiff $100,000 in noneconomic damages and $200,000 in
24    punitive damages;

25  - FINDS Fundomate not liable for religious discrimination;

26  - FINDS Fundomate liable for religious harassment and AWARDS
27    Plaintiff $100,000 in noneconomic damages and $200,000 in punitive
    damages;

28

2

- FINDS Fundomate liable for failure to prevent discrimination and harassment, but awards no damages;

- FINDS Fundomate not liable for wrongful termination in violation of public policy;

- FINDS Fundomate liable for waiting time penalties in violation of Cal. Lab. Code § 203 and AWARDS Plaintiff $21,634.62; and

- AWARDS Plaintiff $2,205.94 in prejudgment interest.

The court sets forth below its findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).[1]  To the extent any findings of fact are inadvertently labeled as conclusions of law (or vice versa), they shall be considered "in [their] true light, regardless of the label that the [] court may have placed on [them]." *Tri-Tron Int'l v. Velto*, 525 F.2d 435, 435 (9th Cir. 1975) (citations omitted).

## FINDINGS OF FACT

### I.    The Parties

Plaintiff received an engineering and architecture degree from Rensselaer Polytechnic Institute and an MBA from the University of California, Los Angeles.  He has substantial experience and expertise in financial services and commercial lending. Day 1 Tr. at 11:3–15:22, 19:15–21:11.  He began his career at Wells Fargo & Company ("Wells Fargo") in commercial lending and worked there for 12 years.  He left Wells Fargo for a period and was employed at Live Capital, a fintech lending company.  After returning to Wells Fargo, he worked in various executive roles and was eventually promoted to Executive Vice President in charge of merchant lending,

---

[1] "In bench trials, Fed. R. Civ. P. 52(a) requires a court to find the facts specially and state separately its conclusions of law thereon." *Vance v. Am. Haw. Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986) (quotation marks omitted).  One purpose behind this rule "is to aid the appellate court's understanding of the basis of the trial court's decision." *Id.* (citation omitted).  "This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." *Id.* (citations omitted).

staying in that role for four years.  In or around 2019, he became the Chief Revenue Officer at Poynt, a company offering point-of-sale devices.  When Poynt was acquired by GoDaddy in or around February 2020, Plaintiff left GoDaddy with a severance package.

Schapiro dropped out of school at age 16 and worked in sales.  Day 2 Tr. at 280:23–281:7.  He developed a specialization in selling funding to small businesses in the merchant cash advance space.  *Id.*  In or around 2016, he co-founded Fundomate and is its Chief Executive Officer and primary shareholder.  *See id.* at 281:8–15.

Fundomate is in the business of embedded merchant lending, which allows businesses to borrow money instantaneously against their daily cash flow, *e.g.*, from credit card transactions.  As Schapiro explains:

> [W]e [Fundomate] give money to small businesses.  The business takes money against transactions they do.  So a customer is processing $10,000 in bagels today.  …  [H]is oven just broke, and he needs $5,000.  There is no bank in the world that is going to give you $5,000 in less than 90 days.  …  So an industry has been born called the merchant cash advance space, where funders, like ourselves, will look at the credit of a business, their transactions, how long they have been in business, the type of industry they are, their cash flow, and see if we're ready to give them money in five minutes.  And we've automated technology … able to make that decision instantaneously, to be able to give that bagel shop $5,000 for his oven.

*Id.* at 294:3–2.

## II.    The Employment Contract

After Plaintiff left Poynt in or around February 2020, he discussed employment with two companies: Fundomate and Fiserv.  Day 1 Tr. at 21:10–24:9.  Ultimately, Plaintiff opted to join Fundomate, becoming its President and Chief Operating Officer.

The terms of his employment were reduced to two writings—an "Offer Letter" and an "Addendum."  Trial Ex. 1 ("Offer Letter"); Trial Ex. 2 ("Addendum").  On

April 29, 2020, Schapiro signed both documents, and, on April 30, 2020, Plaintiff
signed as well.  As relevant here, the Offer Letter provided Plaintiff with:

- a "Base Salary" of $350,000 ($29,167 per month), Offer Letter § 2a;

- an annual performance bonus of $350,000 if Plaintiff achieved certain
  objectives that were to be "set by the CEO" by the end of the calendar
  year, *id.* § 2b;

- benefits "as [Fundomate] may make available generally to its employees
  from time to time during the Employment Term.  This include[d]
  enjoying all Federal Holidays as Paid Time Off (PTO), as well as 2
  weeks of PTO in each calendar year. …  The Benefits [were to] be
  available to [Plaintiff] within 90 days of employment (no later than
  August 4, 2020)," *id.* § 3;

- 5% equity in Fundomate and any of its subsidiaries, "25% of which [was
  to] vest after 12 months of continuous service, and the remaining 75% to
  vest in equal quarterly increments over the next 24 months of continuous
  service," *id.* § 4; and

- the ability to work remotely from his home in Reno, Nevada, but Plaintiff
  would "commute to the Fundomate offices [in Los Angeles, California]
  as necessary," *id.* § 1;

Plaintiff's employment was "at will," meaning "either [he] or Fundomate could
terminate his employment at any time and for any reason."  *Id.* § 5.

Additionally, pursuant to the Offer Letter, Plaintiff's employment duties
"include[d]":

- "review current partners in the Company portfolio and propose and
  execute strategies to maximize the portfolio's performance including
  increasing portfolio size and revenue";

- "review and analyze the Company's advance/lending deals, and work to
  increase the portfolio";

- "review the Company's capital sources, and positions and work to
  improve those";

- "meet with new partners to discuss partnerships";

- "review the organization staffing, model and operations/HR functions

5

and work to establish organization plans and growth";

- "discuss and meet with current investors, in partnership with CEO, and introduce CEO to new investors";

- "work on preparing company for a Seed/Series A round of funding, including working with the leadership team on preparing a pitch deck/business plan, a financial forecast and projection over 3 and 5 years, and an overall investment strategy for the growth of the business"; and

- "other functions commensurate with [the] role of President & Chief Operating Officer[.]"

Offer Letter § 2.  Further, "[w]ithin the first week of employment, [Fundomate] w[ould] provide additional information about the objectives and policies and general employment conditions, including a comprehensive employment agreement, which outline[d] additional employment terms, in accordance with the Company's policies." *Id.* at 3.

The Addendum constituted "an amendment to [the Offer Letter]."  Addendum at 5.  Pursuant to the Addendum, Plaintiff accepted "a reduction of [his] Base Salary" for the first six months of his employment from $175,000 to $93,750.  *Id.* § 1.  The Addendum provided that Plaintiff would be made whole by the end of his first year of employment, *i.e.*, he would be paid $350,000 in base salary by the end of his first year.  *Id.* at 2.  In relevant part, the Addendum states:

> Please note, per our discussions, it is [Fundomate's] intention to discuss and review [Plaintiff's] performance on or before November 10, 2020, and assuming [Plaintiff is] meeting expectations, [Fundomate] intend[s] to keep [Plaintiff] in the role [he is] in, and continue all other terms under the [Offer Letter].  This includes [Fundomate] making best efforts to make [Plaintiff] whole on [his] Base Salary and other compensation elements in the [Offer Letter].  *As part of that, [Fundomate] will from November 11, 2020, to May 10, 2021, add a prorated amount above [Plaintiff's] normal Base Salary (which is $29,167 per month), in equal monthly increments.*  The amount added monthly will be between 25%

(additional $14,583 per month[2]) to 75% of the month balanced owed, depending on market conditions.  *It is [Fundomate's] plan to make best efforts to make [Plaintiff] whole on your Base Salary for year 1 of $350,000*, and if more time is needed to do so and you are [not] whole by the end of your first year, we will make up any remaining gap up in your second year of employment, which would begin May 11, 2021.

*Id.* at 5 (emphases added) (footnote added).  Put simply, for the first six months, Fundomate would pay Plaintiff $93,750, and, for the six months thereafter, Fundomate would make its "best efforts" to pay Plaintiff $256,250 ($350,000 per year - $93,750 paid for the first six months = $256,250).  Plaintiff, thus, would be paid $42,708.33 per month for the second six months ($256,250 per six months / six months = $42,708.33 per month).

The Addendum further provided that Plaintiff was "only eligible for a Performance Bonus at a prorated amount per [the Offer Letter], for the second 6 months of [Plaintiff's] tenure with the Company."  *Id.* § 1c.  Lastly, Fundomate had the option to award Plaintiff a performance bonus for the first six months if Fundomate "achiev[ed] certain mile stones [sic] or funding."  *Id.*

Plaintiff and Schapiro offered contrasting explanations for Plaintiff's reduced pay for the first six months of employment.  According to Plaintiff, Schapiro requested Plaintiff temporarily receive reduced pay so Fundomate could have its COVID-related loans from the United States Small Business Administration ("SBA") forgiven—specifically, Fundomate obtained a $500,000 "EIDL loan" and a $300,000 "PPP loan."  Day 1 Tr. at 37:14–39:10; 49:23–50:7; 51:6–18.  Plaintiff explained Fundomate was not required to repay these loans if, among other things, it kept

---

[2] The language in the Addendum—"additional $14,583 per month"—appears to be a drafting or mathematical error.  Plaintiff was to be paid his Base Salary for the latter six months—*i.e.*, $29,167 per month or $175,000 per six months.  Thus, an "additional" amount of $13,541.67 per month would need to be paid above the Base Salary for Plaintiff to earn a total of $350,000 after 12 months (($256,250 per six months - $175,000 per six months) / 6 months = $13,541.67 per month).

salaries below a certain amount. *Id.* at 38:9–16; *see also* Day 2 Tr. at 393:8–394:5 ("Q: The PPP loan was forgiven in full?  Schapiro: Yes.").  Plaintiff contends he agreed to the salary reduction because he intended to be with Fundomate "for the long haul" and believed he would be made whole pursuant to the Addendum.  Day 1 Tr. at 39:1–7.  Plaintiff also testified Schapiro did not want this purpose documented in case Fundomate were audited. *Id.* at 39:8–10.

Schapiro, in contrast, testified he was not going to hire Plaintiff because he could not afford to pay Plaintiff $700,000 plus equity.  Day 2 Tr. at 311:16–312:1, 312:20–313:18.  In response, according to Schapiro, Plaintiff offered to work for a six-month trial period at reduced pay. *Id.* at 314:1–316:1; *but cf.* Day 1 Tr. at 49:23–50:11 (Plaintiff: "Never did [a trial period] come up in discussions with [Schapiro].  Again, my understanding was that it was a period of reduced pay in order to circumvent the PPP and EIDL requirements, so that [Schapiro] would be able to have documentation to get loan forgiveness.").

Neither employment agreement included a six-month trial period provision.  The court credits Plaintiff's explanation as credible, and rejects Schapiro's.

### III. Plaintiff's Employment at Fundomate

#### A. Two Goals to Grow the Company

Plaintiff began his employment on May 18, 2020, and had two primary goals to grow the Company.  Day 1 Tr. at 52:9–23 ("I wasn't coming to Fundomate to help them grow loans by 1 percent or 2 percent. … [Schapiro] told me, 'I want you to come here and turn this into Square.  Take us on a rocket ship ride[.]'"); *see also* Offer Letter § 2 (Plaintiff's duties included "maximiz[ing] the portfolio's performance including increasing portfolio size and revenue"); Day 2 Tr. at 307:16–17 ("Q: What was the most important duty that you wanted added [to the Offer Letter]?  Schapiro: 'Building the company's performance.'").

First, Plaintiff sought to secure a warehouse line of credit, *i.e.*, capital loaned from a bank or other financial institution for the purpose of lending it to others.  Day 1

Tr. at 52:23–54:1 (Plaintiff: "So getting [this] done was absolutely the most important
thing this company could do to grow revenue … by far and I knew that."); *see also*
Offer Letter § 2 (Plaintiff's duties included "review[ing] the Company's capital
sources[] and positions and work[ing] to improve t[hem]").

Second, Plaintiff wanted to secure operating capital from a venture capital
("VC") or private equity firm. Day 1 Tr. at 54:2–15 (Plaintiff: "I knew I needed to
raise real institutional capital from a legitimate [VC] firm who [had] deep pockets that
could continue to fund our growth."), 74:1–10 (Plaintiff: "[S]econd only to the
importance of the warehouse line of credit to scale the company rapidly and grow
revenue … would be having the operating capital to grow the organization so that
you're not growing incrementally … that injection of operating capital is critical in
any start-up company."); *see also* Offer Letter § 2 (Plaintiff's duties included
"work[ing] on preparing company for Seed/Series A round of funding, including
work[ing] with the leadership team on preparing a pitch/deck business plan").

Schapiro agreed these two items were very important, if not the most important,
objectives at the time. Day 1 Tr. at 55:4–10. The court rejects Schapiro's testimony
to the contrary and finds it not credible. *See* Day 2 Tr. at 289:18–290:11.

## 1.    Warehouse Line of Credit

Plaintiff made substantial efforts to put Fundomate in a position to obtain a
warehouse line of credit, and, ultimately, because of Plaintiff's work, Fundomate
secured a $25 million line of credit from Revere Bank, which closed after Fundomate
terminated Plaintiff. Plaintiff created, prepared, and organized all the relevant
documentation so Fundomate could credibly approach banks and credit facilities. Day
1 Tr. at 55:11–57:18 ("[W]e worked tirelessly around the clock putting together,
literally, a hundred documents in Excel. … [Fundomate] didn't have anything in
writing, no policies, no underwriting policies, no underwriting guidelines, no risk
policies, no nothing. It was all just being done … like a mom-and-pop type business.
… We put that all together."), 64:12–67:14 ("We had financials that were in

shambles.  We had to get those into proper formatting, so we had to build consolidated financial statements, very complex to do because the reconciliation takes a tremendous amount of work to get down into literally looking loan by loan by loan by loan what are the terms, is it being reflected properly.  …  We had to build pitch decks … that communicate the vision of the company, the mission of the company, what your product is, how you go to market, how you sell the product, what the size of the market is, what are your competitors doing, how do you compete against your competitors.  We literally had to do all of that research, sales, marketing, operations.  We had to pull it all together."); *see also* Offer Letter § 2 (Plaintiff's duties included "review[ing] and analyz[ing] the Company's advance/lending deals, and work[ing] to increase the portfolio").

Plaintiff also found and retained David Piotrowski of Waterford Capital ("Piotrowski") to connect Fundomate to lenders who specialized in warehouse lines of credit.  Day 1 Tr. at 57:19–62:21 ("[W]e needed to get access to the right kind of lenders.  These are [a] very specialized group of lenders that lend warehouse lines of credit.  [] I had grown up in the leading lender in the nation, lending to businesses.  But I had never done warehouse lines of credit.  …  I started talking to banks directly in my network … [and found] David Piotrowski.  …  He focuses on merchant capital advances in particular."); Ex. 21.

While this work was ongoing, both Schapiro and Fundomate's co-founder and Chief Technology Officer, Nir Bareket ("Bareket"), expressed satisfaction with Plaintiff's work.  Day 1 Tr. at 72:2–23 ("[Schapiro] and [Bareket] were growing [] so excited that they were seeing things come together and they were realizing … we were building momentum towards getting this line of credit and getting in front of venture capital firms with [a] really professional looking presentation and really, all of the data put in the proper order."); Trial Ex. 52.

Ultimately, Fundomate secured multiple term sheets for warehouse lines of credit, including from Revere Bank.  After term sheets were issued, additional

diligence was required before the line of credit was actually committed.  Fundomate

eventually closed on a $25 million line of credit with Revere Bank, as detailed below.

*Id.* at 62:23–64:11, 136:6–12, 151:12–19, 152:3–8; *see infra* Findings of Fact

§ III.A.1.b.

a.    **Authenticity of Emails Providing Plaintiff a Bonus for**

**Sourcing Line of Credit**

As the warehouse line of credit began to materialize, Schapiro urged Plaintiff to

close the deal.  Day 1 Tr. at 111:2–112:19.  As an extra incentive, Schapiro offered to

pay Plaintiff a bonus equal to a percentage of the total line of credit closed.  *Id.*

Plaintiff memorialized this conversation in an email to Schapiro, dated September 17,

2020, writing: "now that the bank NDAs are signed, and given the agreement with

David Piotrowski has been in place… i'd like to ensure you agree to my additional

bonus payout once the bank [line of credit] closes of 1.5% x [line of credit] amount

assuming over $25M."  Trial Ex. 4 (ellipsis in original).  Schapiro responded: "As

long as you sourced the deal directly, or through our agreement with Dave P, then yes

agreed.  I expect you to do Tefillin with me, and you need to have a Bar Mitzvah."[3]

*Id.*

Schapiro contends Plaintiff fabricated these emails.  Day 2 Tr. at 358:24–59:1

("There is not one iota of doubt in my existence that this is 100 percent counterfeit,

fraud document.").  Schapiro avers he never had any discussion with Plaintiff about a

bonus for securing a line of credit, *id.* at 359:7–11, never demanded Plaintiff put on

tefillin or have a bar mitzvah, *id.* at 116:16–18, 372:2–5, 375:19–23, 409:4–22, and

first saw the emails when Plaintiff produced them during discovery, *id.* at 358:8–22.

Defendants hired a computer forensics expert who performed a search of Fundomate's

email system for the emails.  The expert did not find a copy of the emails in Plaintiff's

---

[3] According to Schapiro, tefillin are "black phylacteries that are made of all leather"
that "[o]nly Jewish males" wear.  Day 2 Tr. at 373:4–375:15.  "When a Jew puts on
tefillin for the first time, he has a bar mitzvah."  *Id.* at 372:6–12.

11

account and never searched Schapiro's account.  Dkt. 105 (Stipulated Facts) ¶¶ 1–3.
The expert acknowledged during his deposition he had no way of knowing whether
the emails had been deleted before his inspection.  *Id.*

Schapiro also offered several reasons why he believed the emails were
fabricated.  *Id.* at 359:19–23.  Specifically, he testified: the formatting was off (*id.*
at 359:25–360:24, 365:14–366:6, 370:17–371:23); he had never written an email to
Plaintiff in blue font other than the termination email (*id.* at 360:25–362:1); he never
used commas (*id.* at 362:2–6, 364:19–22); he would never say to put on tefillin and
have a bar mitzvah because it was redundant (*id.* at 371:24–373:2); and the Trustpilot
widget in his email signature—which showed the number of Fundomate reviews on
Trustpilot's website—updated every time the email was viewed, and Fundomate did
not have 450 reviews on Trustpilot as of November 1, 2020, when Plaintiff
purportedly printed the emails (*id.* at 380:6–382:18[4]).

Plaintiff testified the emails were authentic.  Day 1 Tr. at 114:13–15; Day 2 Tr.
at 460:6–25.  He opined the Trustpilot email widget only ran the first time the email
was opened, Day 2 Tr. at 456:18–460:6, and disagreed with Schapiro's contentions
regarding the emails' purported formatting issues, *id.* at 460:7–25.  Plaintiff further
explained that, when he sensed he was being pushed out of Fundomate, he made
backups of these emails.  Day 1 Tr. 113:22–121:25.  Specifically, on November 11,
2020, he opened the emails on his computer and took photographs of the computer
screen with his iPhone.  Trial Ex. 29.  The same day, he printed a physical copy.  Trial
Ex. 4.  As further corroboration, Plaintiff cited a self-assessment he emailed to
Schapiro.  Trial Ex. 17 ("Bank Line of Credit … targeting $20mm+ ([Schapiro]
shared this is my #1 priority, and that I will get an extra bonus of 1.5% of the [line of

---

[4] After the first day of trial, Defendant "realized in the middle of the night" the
purported Trustpilot discrepancy.  Day 2 Tr. at 379:17–25.  Neither Defendants nor
Plaintiff offered any expert testimony regarding the authenticity of the emails at trial,
and no employee for Trustpilot testified.

credit] once closed for sourcing it, given my contacts)"); Day 1 Tr. 99:3–7.

      Additionally, Plaintiff testified Schapiro pressured him on multiple occasions to put on tefillin and have a bar mitzvah. *See* Day 2 Tr. at 452:9–453:15:

> Q: Did Mr. Schapiro ever tell you that you should get a bar mitzvah?

> A: He did, on multiple occasions. And it wasn't inviting you, like [how Schapiro testified]. I sat in his office about two months into the role. … He had some Jewish artifacts on the wall. And I'll never forget it, because I'd only been there, like, 60 days. And it was in that conversation that I told him that my mother's mother was Jewish. But I said, I am a Christian, born again Christian. My sister is a pastor; my brother is a pastor. I grew up going to Sunday school and church since I was a little kid. And I said, 'I believe in Jesus, and it's important to me.' And he just was taken back by that, almost as if, how could I have hired a guy who believed in Jesus; right? That's the reaction I had in his office. And he said to me, 'Glen, I want to be clear with you. Given that you're Jewish, you're going to need to have a bar mitzvah to be on my team, because this is a Jewish company.' Those were his exact words to me.

> Q: Was there ever any other mention of getting a bar mitzvah as it related to your employment at Fundomate?

> A: Yeah. Later on, months later, when we were talking about the bonuses, he said to me that he's not going to give me a bonus unless I get a bar mitzvah. Again in his office. And I said, 'You must be joking,' and he looked at me and shook his head.

*See also id.* at 373:3–375:15 (Schapiro: "[W]hen I go to conferences and et cetera, [] I ask people if they want to put on tefillin. I always have a pair of tefillin with me."); Day 1 Tr. at 112:13–113:18.

      The court finds Plaintiff produced sufficient evidence to support the conclusion that the emails are authentic. Fed. R. Evid. 901(a). The court finds credible Plaintiff's testimony that he did not fabricate the emails and credits the photographs and printout of the emails as corroborating evidence. Trial Exs. 4, 29. Defendants' computer forensics expert did not testify at trial, his qualifications and the thoroughness of his investigation were never offered, and no explanation was given as to why the expert

did not search Schapiro's email account as part of a comprehensive investigation. The
court also credits Plaintiff's testimony regarding Schapiro's demands that Plaintiff put
on tefillin and have a bar mitzvah, which support that Schapiro would put the same in
writing. Lastly, the court finds speculative and unreliable Plaintiff and Schapiro's
opinions regarding the technical aspects of the emails, as neither Plaintiff nor Schapiro
provided any foundation for their opinions, or otherwise established they were
qualified to opine on these topics as neither had ever worked for or had personal
familiarity with Trustpilot or any algorithm it may use in its emails.

### b.    The Amount of the Revere Bank Line of Credit

The court finds Plaintiff sourced a line of credit with Revere Bank in the
amount of $25 million. Day 1 Tr. at 62:23–64:11, 136:6–12 (David Piotrowski: "It
was a $25 million committed credit facility."), 151:12–19, 152:3–8 (David
Piotrowski: "We were paid as if it was a $25 million line because it was only a $25
million line of credit."). Upon Fundomate's request, Revere Bank had the ability to
increase the amount to $50 million, but as of the date of trial, Revere Bank had not
agreed to any increase. *Id.* at 151:12–19, 152:12–16.

In an attempt to show the line of credit was more than $25 million, Plaintiff
offers Trial Exhibit 28, a 3-page printout that appears to be a press release titled,
"Fundomate Announces $50 Million Line of Credit to Bring Embedded Automated
Funding and Real-Time Banking to Payments and SMB Marketplaces." Certain
statements therein are attributed to Defendants. *Id.* Defendants objected to its
admission as hearsay, and the parties submitted post-trial briefing on the issue. Dkts.
111, 112.

Defendants rely on *Larez v. City of Los Angeles*, 946 F.2d 630, 641 (9th Cir.
1991). In *Larez*, a police chief ("Gates") was interviewed by reporters after he
testified. *Id.* The next morning, articles in the *Los Angeles Times*, the *Herald-
Examiner*, and the *Daily News* attributed certain statements to Gates, and, thereafter,
the trial court admitted those statements as nonhearsay admissions by a party

14

opponent. *Id.* at 641–42; *see* Fed. R. Evid. 801(d)(2)(A). The Ninth Circuit reversed, finding the reporters' statements—*i.e.*, their quotations of Gates—were inadmissible hearsay. *Larez*, 946 F.2d at 642. The court explained:

> As the reporters never testified nor were subjected to cross-examination, their transcriptions of Gates's statements involve a serious hearsay problem. First, the reporters' transcriptions were out-of-court statements. By attributing quotations to Gates, the reporters necessarily made the implicit statement, "Gates said this!" As the reporters' statements were made in newspapers, they were, *a fortiori*, statements made out-of-court where they were not subject to the rigors of cross-examination. Second, the statements—"Gates said this!"—were offered for the truth of the matter asserted: that Gates did in fact make the quoted statement.

*Larez* is inapposite because the statements there were made by third-party reporters, whereas here, the statements in Trial Exhibit 28 were authored by Defendants, approved by Defendants, or made with Defendants' authorization. Day 1 Tr. at 149:5–6 ("Q: Do you know who issued this? Piotrowski: Yes. This was … a collaboration between Revere [Bank], Waterford [Capital], and Fundomate."); 150:20–22 ("Q: Did you participate in the creation of this document? Piotrowski: Yes."); Day 2 Tr. at 420:15–422:2 (Schapiro: "I'm not sure if it was [Piotrowski who] initiated it, or [Revere Bank] initiated, but we approved …."); Fed. R. Evid. 801(d)(2)(A)–(C) ("A statement that meets the following conditions is not hearsay: … (2) An Opposing Party's Statement. The statement is offered against an opposing party and: (A) was made by the party in an individual or representative capacity [or] (B) is one the party manifested that it adopted or believed to be true [or] (C) was made by a person whom the party authorized to make a statement on the subject[.]"). Accordingly, Defendants' objection to Trial Exhibit 28 is OVERRULED, and Trial Exhibit 28 is ADMITTED.

In any case, Trial Exhibit 28 does not alter the court's finding that Fundomate closed a $25 million line of credit. The court credits Piotrowski's explanation that the committed credit facility was only for $25 million, but "Revere had the ability, subject

1  to Fundomate requesting an increase and Revere going back and getting full formal

2  approval … to increase the committed amount from 25 to 50 million over time."

3  Day 1 Tr. 151:12–19.  Tellingly, Piotrowski acknowledged he was "paid as if it was a

4  $25 million" line of credit.  *Id.* at 152:3–8; *see also* Trial Ex. 21 (agreement indicating

5  Waterford Capital would have received additional money if a $50 million line of

6  credit closed).  Defendants' statement that Fundomate "clos[ed] a $50 million line of

7  credit with Revere Capital" was false.  Trial Ex. 28.

8  ### 2. Venture Capital Funding

9       From his network, Plaintiff determined Ulu Ventures, a VC firm, would be the

10  best partner for Fundomate.  Day 1 Tr. at 74:11–75:9 (Plaintiff: "[Schapiro] had given

11  me what his guidelines were, and I went out seeking the ideal venture capital partner.

12  And I tapped into my network.  I knew 50 VCs.  One [] that came to mind was a

13  gentleman named Kevin Hoffberg.  …  He [was a partner at] Ulu Ventures[.]  …  I

14  thought he'd make an excellent, not only investor, but potential board member.").

15  Plaintiff then began discussions with Ulu Ventures and, after substantial efforts,

16  secured a term sheet on October 14, 2020.  Trial Ex. 14; Day 1 Tr. at 75:10–79:21

17  (Plaintiff: "[I]t is not easy to get a venture capital firm to issue a term sheet at Series

18  A.  It is very, very difficult, especially a firm like this that is known as one of the best

19  lenders to fintech lending companies like SoFi.  They are very, very picky.  I think

20  [Ulu Ventures] said for every 800 deals they look at, they only take one to their

21  investment committee.  …  [T]hey do a lot of due diligence.  …  [T]he amount of

22  work that you need to do to get the story and the financials and the business in shape

23  in order to get them to issue [a] term sheet is a lot of work.").

24       Schapiro, however, ultimately decided to back away from the opportunity

25  because he did not want to give up control of his business and wanted to be repaid,

26  through the venture capital investment, funds he had invested in Fundomate

27  (approximately $500,000).  *Id.* at 79:23–81:23 (Plaintiff: "[Schapiro] had taken this

28  deal that I got to the one yard line, that announcement would have sent him on a

trajectory that he wouldn't have believed. … And he was super excited about that and just giddy … but he was also scared because he knew that he was giving up control. In order to do this, he would have people in there scrutinizing his business, leading his business, and he wasn't used to that."), 82:16–21, 83:13–84:2 (Plaintiff: "One issue I was aware of was that [Schapiro] wanted a repayment of some money from the company. And I had warned [Schapiro], 'Sam, that is thinking short sighted … don't go there. If this company is going to give you a check for a million dollars and [a] half dollars, don't think about that check. Think about that next one. And think about taking this company public … It's life changing."); Day 2 Tr. at 338:2–340:5 (Schapiro: "I wasn't ready to [forget] … about the $500,000. I've invested everything I've ever gotten my hands on into this company. … [I] had an understanding that, when the company would … have a good foundation, that money would be rightfully returned to me … Why do I need to give away … equity? And more importantly than equity, control?").

### B. Hiring Employees

Pursuant to the Offer Letter, Plaintiff's duties included "review[ing] the organization staffing, model and operations/HR functions and work[ing] to establish organization plans and growth." Offer Letter § 2. Plaintiff attempted to hire persons to fill leadership roles, but Schapiro did not want to pay for them. Trial Ex. 10 (email from Plaintiff to Schapiro regarding scheduled interviews for Director of Finance, Collections Representative, and Marketing Director); Day 1 Tr. at 88:21–90:24 (Plaintiff: "I had been telling [Schapiro] all along that, in order to grow, we got to bring in A-level talent. … [Schapiro] was telling me, 'we got to grow,' but he was telling me he's not going to let me have any budget to hire anybody. … [H]e kept saying, 'well, I don't want to pay them yet until we get that bank line of credit. And until we get the venture funding, I don't want to pay them.'"). Schapiro hired one of those candidates after terminating Plaintiff. Day 1 Tr. at 89:22–90:2.

/ / /

**C.    Health Benefits and Work from Home**

It was critical to Plaintiff's decision to join Fundomate that he be able to work from home and that he receive health benefits.  His son was very sick at the time, and Plaintiff had to carry him up and down the stairs because his wife was physically unable.  Plaintiff's employment was also in the middle of the COVID-19 pandemic.

Within a week after his employment began in May 2020, however, Schapiro demanded Plaintiff come into the office.  Fundomate also never provided Plaintiff any health care insurance coverage.  In relevant part, Plaintiff testified:

Q: Were you based in Reno, Nevada during the time that you worked for Fundomate?

Plaintiff: I was living there with my family.  I want to take a moment and elaborate for a minute here.  This was very important to me.  I was based in Reno with Poynt, and my CEO [] was comfortable with the fact that I was working remotely.  By the way, I work remotely today.  … So just so you know, I've worked remotely almost my whole career.  It was critical that I be based in Reno, and I told [Schapiro] this.  We have four kids.  My son Jake who was 16 at the time had—became extremely ill. [Plaintiff becomes emotional.]  Sorry about that.  I apologize.  He almost died, and he was in a wheelchair for a period of time.  We had a two-story home.  I had to carry him upstairs.

The court: Do you need a minute?

Plaintiff: I apologize.  I didn't think that would hit me.  I haven't thought about it in a while.  He got very sick, almost died. I had to carry him upstairs every day and downstairs.  And my wife was petite and couldn't do it.  Thank God he's recovered today, though.  Anyway, it was critical. And my manager at Poynt understood that.  I told that to [Schapiro]. It was during COVID as well.  And if you recall California was shut down. You weren't supposed to go in the office.  In fact, I was living in Nevada, but in California, the governor had said you can't go in the office. Things were shut down.  It was very difficult to travel.  And I made it clear that I needed to be in Reno, so [Schapiro] agreed to it.  Your question was: Was I based there?  Very quickly, [Schapiro] made it clear I had to be in the office.  It's not something I expected, but I did it.  I ended up having to lease a place in Beverly Hills in order to keep, you know, keep him happy.  It made it very difficult on my family.

The court: This is during the pandemic? …

Plaintiff: Yes.

The court: What months would that have been?

Plaintiff: I ended up starting that lease, well, pretty much a week after I started … [H]e had cut everybody's pay during COVID. And you'll see in a moment that was the genesis of what we called an addendum, and I'll have to explain why. But he cut everybody's pay and required everybody to be in the office. [T]his is after I accepted this offer. So I'm having to now travel during COVID when we weren't supposed to do that. Sometimes, I had to—really tough to fly. I was driving seven hours each way, pretty much every week. I leased a place there—I was staying at hotels initially, and then I leased a place, I think, I started [the] lease I want to say May or early June, something like that. So, yeah. He didn't let me work from Reno is the point.

The court: My question was the timing. Your letter is dated April 29, 2020. So when is it that [Schapiro] started to insist that you come into the office in person along with others?

Plaintiff: About a week after I started. May 11th was my start date, at least in this letter. But I want to say it was by late May, he was saying, 'I want you in the office.'

Day 1 Tr. at 33:22–36:9

### D.    Performance Objectives and Performance Review

Plaintiff asked Schapiro several times to define his objectives and provide a performance review, but Schapiro provided neither. Day 1 Tr. at 46:2–24 ("Q: Were you ever given a definition of what those milestones were …? Plaintiff: No. Q: Did you ever ask [Schapiro] to provide you a definition of what … those milestones would be? Plaintiff: Numerous times. Q: What was the response that you got? Plaintiff: 'I'll get it to you.' Q: But you never actually received it; right? Plaintiff: Never received a single set of expectations from [Schapiro] the entire time except, I think, three days before he wrongfully terminated me."), 48:14–25 ("Q: When you say there was no discussion of performance, did you ever request to have a discussion of your performance? Plaintiff: Numerous times I said that[.] … [Schapiro] never did any

19

one-on-ones, no coaching, no discussion of performance trends, never."), 91:4–95:18 (Plaintiff: "[Schapiro] never gave me any objectives.  He never laid out performance objectives of any type.  He never gave me any kind of review.  He never summarized performance like any manager would do.").

Plaintiff further explained that every six months throughout his career, he created written performance reviews of himself.  *Id.* at 91:4–92:8.  He created such a review while at Fundomate, Trial Ex. 17, and provided a copy to Schapiro, who did not read it, Day 1 Tr. at 92:9–12; Day 2 Tr. at 344:20–22 ("Q: [D]id you read the self-assessment that [Plaintiff] provided to you?  Schapiro: I skimmed through it very, very briefly.").

### E.   Religious Harassment

As described, after Schapiro learned Plaintiff's maternal grandmother was Jewish, Schapiro urged Plaintiff to put on tefillin and have a bar mitzvah if he wanted to remain at Fundomate and receive a bonus for securing the warehouse line of credit. *See supra* Findings of Fact § III.A.1.a; Day 1 Tr. at 112:13–113:18; Day 2 Tr. at 452:9–453:15; Trial Ex. 4.  Schapiro sent Plaintiff text messages concerning this topic:

> Schapiro: Quick thought when we close the [investment] round God willing we do tifflin.
>
> Plaintiff: What is tifflin?
>
> Schapiro: Google it.  It's the act that defines a bar mitzvah.
>
> Plaintiff: Oh got it.
>
> Schapiro: I think if we agree it would give us tremendous blessings.
>
> Plaintiff: Well I'll give that thought.  I love God 100% either way.  So He knows I'm fully on board as His son!  But I'm thinking we do tifflin when we reach $200,000,000 in revenue.
>
> Schapiro: It's worth a lot more than that.  If there is one thing I can convince you on is this.
>
> Plaintiff: Yes I understand.  Well let me give that more thought.

1   Schapiro: We can discuss further.

2   Trial Ex. 43 (misspellings in original) (punctuation modified and added for clarity).

3   When asked about these text messages, Schapiro testified his "point was that putting

4   on tefillin was worth more than 200 million in revenue" and claimed the messages

5   were a "late conversation, after hours" that had "[n]othing to do with work," despite

6   raising the close of the then-anticipated venture capital funding as the triggering event.

7   Day 2 Tr. at 415:2–8.

8   Schapiro also asked Plaintiff and his other employees not to work during

9   Shabbat.  Day 1 Tr. at 113:12–20 (Plaintiff: "[D]uring Shabbat, Friday evening

10   through Saturday evening, [Schapiro] forbid me from working even if it was not

11   related to Fundomate.  I couldn't work at all.  Couldn't text, even if it was on my

12   own."), 116:10–14; Trial Ex. 29 at 3 (Plaintiff: "You have time to chat?  Bareket: "I

13   do but [Schapiro] doesn't like me to work on Friday night (Shabbat).").  Schapiro,

14   however, would regularly call Plaintiff about work-related matters on Sundays, when

15   Plaintiff attended church.  Day 1 Tr. at 113:15–18.

16   **F.    Plaintiff's Termination**

17   On November 10, 2020, Schapiro sent Plaintiff an email requiring him to

18   deliver certain "key financial and business goals."  Trial Ex. 3.  The email was

19   pretextual to Plaintiff's termination.  The "goals" set forth therein had never been

20   discussed, even though Plaintiff repeatedly requested objectives and a performance

21   review.  *See supra* Findings of Fact § III.D; Day 1 Tr. at 46:2–24, 48:14–25, 91:4–

22   95:18; *see also* Day 2 Tr. at 252:25–253:7 ("Q: Had you personally ever written an e-

23   mail to [Plaintiff] setting forth key performance indicators prior to this Exhibit 3 on

24   November 10, 2020?  Bareket: I drafted it but never sent it. … Unfortunately, I

25   deleted this draft after [Plaintiff] left the company[.]").  Tellingly, the goals were

26   unrealistic.

27   Despite the pandemic, which crippled Fundomate's ability to loan money

28   because of the availability of fully forgivable SBA loans, Plaintiff would now be

21

required to cause revenues to "more than doubl[e]" in 2021, and, if he wanted to

receive any bonus, grow revenue by at least 20% during the time period from

November 18, 2020 through February 28, 2021 and sign five partnerships with

projected annual revenues of $350,000 per partnership.  Trial Ex. 3; *see* Day 1 Tr.

at 51:6–52:8 (Plaintiff: "[T]he government was lending money … at almost zero

percent interest rates that could be forgiven if you follow the rules, so it's like free

money.  …  So how could a lender lend money to a small business at 20, 21 percent,

or 30 percent, which is what Fundomate was charging at that time …?").  Schapiro

acknowledged there was no demand for loans from Fundomate.  Day 2 Tr. at 300:16–

18 (Schapiro: "I knew that … even if [Plaintiff] did the best he [could], [Fundomate]

would not be profitable …  It [was] COVID.  Nobody was borrowing at that time."),

325:21–25 (Schapiro: "[T]here wasn't a lot going on at the time.  It was COVID.

Businesses weren't taking as much money.  The demand wasn't there.").  Plaintiff was

further required to hire persons for leadership roles in marketing, sales, and finance,

even though, as described, Plaintiff had already presented qualified persons for these

positions, and Schapiro had refused to pay for them.  *See supra* Findings of Fact

§ III.B.  Schapiro then terminated Plaintiff the day before the true-up period was to

begin, when Fundomate would have had to start paying Plaintiff $42,708.33 per

month.

In total, during Plaintiff's employment, Fundomate paid Plaintiff $93,750 and

reimbursed him $8,534.10 in costs.  Day 1 Tr. at 173:3–14.  After his termination,

Plaintiff was unemployed for 96 days until February 22, 2021.  *See id.* at 106:25.

## CONCLUSIONS OF LAW

### I.    Alter Ego Liability of Fundomate, LLC

Plaintiff asserts all of his claims against both Fundomate, Inc. and Fundomate,

LLC.  Dkt. 2.  Plaintiff does not dispute Fundomate, Inc. employed him, but contends

Fundomate, LLC is liable as Fundomate, Inc.'s alter ego.  Pl.'s Mem. at 1 n. 1; *see*

*Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 299 (1985) ("Where the alter ego doctrine

1  applies, [] the two corporations are treated as one for purposes of determining

2  liability."); *Hasso v. Hapke*, 227 Cal. App. 4th 107, 155 (2014), *as modified on denial*

3  *of reh'g* (July 15, 2014) ("Generally, alter ego liability is reserved for the parent-

4  subsidiary relationship.  However, under the single-enterprise rule, liability can be

5  found between sister companies.") (cleaned up); *Toho-Towa Co. v. Morgan Creek*

6  *Prods., Inc.*, 217 Cal. App. 4th 1096, 1107 (2013) (under the single-enterprise rule, a

7  court may disregard the corporate form "in order to hold one corporation liable for the

8  debts of another affiliated corporation when the latter is so organized and controlled,

9  and its affairs are so conducted, as to make it merely an instrumentality, agency,

10  conduit, or adjunct of another corporation.") (cleaned up).

11       Under California law, two requirements exist for entities to be considered alter

12  egos.  First, there must "be such unity of interest and ownership that the separate

13  personalities of [the entities] no longer exist." *Mesler*, 39 Cal. 3d at 300 (citation

14  omitted).  Second, "if the acts are treated as those of the corporation alone, an

15  inequitable result will follow." *Id.* (citation omitted).  The alter ego test encompasses

16  a host of non-exhaustive factors, including commingling of funds and assets, failure to

17  maintain adequate corporate records, disregard of legal formalities and failure to

18  maintain an arm's length relationship, inadequate capitalization, identical ownership,

19  use of the same office or business location, use of one entity as a mere conduit for the

20  other entity, and complete domination and control by one entity. *Zoran Corp. v.*

21  *Chen*, 185 Cal. App. 4th 799, 811–12 (2010).

22       Here, Plaintiff fails to meet his burden to establish either element.  Regarding

23  the first element, Plaintiff offers *only* that Schapiro could transfer money between the

24  entities "without any oversight or approval."  Pl.'s Mem. at 1 n. 1 (quoting Day 2 Tr.

25  at 408:19–23).  This alone does not establish the entities have such a unity of interest

26  and ownership that the separate personalities of the entities no longer exist.  Plaintiff

27  offers no evidence regarding the second element.

28       Accordingly, the court FINDS Fundomate, LLC not liable on every claim.

**II.    Breach of Written Contract**

Plaintiff claims breach of contract against Fundomate.  Compl. at 12.  To
succeed on this claim, Plaintiff must prove that: (1) Plaintiff and Fundomate entered
into a contract; (2) Plaintiff did all, or substantially all, of the significant things that
the contract required him to do; (3) Fundomate failed to do something the contract
required it to do; (5) Plaintiff was harmed; and (6) Fundomate's breach of contract
was a substantial factor in causing Plaintiff's harm.  Judicial Council of California
Civil Jury Instructions ("CACI") No. 303.

**A.    Contracts Formed**

The parties entered into two contracts (the "Contracts").  The first contract
comprised the terms set forth in the Offer Letter, as amended by the Addendum (the
"First Contract").  The second contract comprised the terms set forth in the emails sent
by Plaintiff and Schapiro on September 17, 2020 (the "Second Contract").  Ex. 4.
Under the Second Contract, if Plaintiff sourced a warehouse line of credit in excess of
$25 million, he would be entitled to a bonus equal to 1.5% of that amount.

**B.    Substantial Performance**

During the six months Plaintiff was employed, he performed substantially all of
the significant things he was required to and reasonably could do in six months.  *See*
Offer Letter § 2; *supra* Findings of Fact §§ III.A, III.B; Day 1 Tr. at 50:24–93:13;
Trial Ex. 17; Day 2 Tr. at 415:12–416:17, 420:15–421:12, 434:2–9.  The court rejects
Defendants' arguments to the contrary, including their argument Plaintiff did not
substantially perform because Fundomate's operational revenue did not increase
during Plaintiff's tenure.  Def.'s Mem. at 5–6.  As described, Plaintiff joined
Fundomate during the COVID-19 pandemic, and both Plaintiff and Schapiro
explained COVID had a significant impact on Fundomate's ability to loan money
because businesses had access to fully forgivable loans from the SBA.  *See supra*
Findings of Fact § III.F.  Contrary to Defendants' arguments, and in line with the
duties set forth in the Offer Letter, Plaintiff positioned Fundomate for substantial

future growth by sourcing a warehouse line of credit with Revere Bank—which closed after Plaintiff's termination—and securing an investment offer from a reputable VC firm—which Schapiro declined.  Offer Letter § 2; *see also* Day 2 Tr. at 307:16–17 ("Q: What was the most important duty that you wanted added [to the Offer Letter]? Schapiro: Building the company's performance.").  These two accomplishments, among the other services Plaintiff provided during his only six-month tenure, demonstrate he substantially performed his obligations.

## C.    Breach and Damages

Plaintiff contends Fundomate breached the Contracts because Fundomate did not: (1) pay him his $350,000 annual salary; (2) pay him any performance bonus; (3) compensate him for paid time off ("PTO"); (4) convey equity to him; (5) permit him to work from his home in Reno, Nevada; (6) provide health insurance or fringe benefits; (7) conduct an evaluation of his performance; (8) provide performance objectives; or (9) pay him a bonus for sourcing the warehouse line of credit from Revere Bank.  Pl.'s Mem. at 12–13.  The court addresses each alleged breach in turn.

### 1.    Salary

Plaintiff was owed $93,750 for the first six months of employment.  *See* Addendum § 1a.  Fundomate paid Plaintiff this amount and, thus, did not breach this term of the First Contract.

### 2.    Performance Bonus

Fundomate had the option to pay Plaintiff a bonus during the first six months of his employment if Fundomate achieved certain "milestones" or "funding." Addendum at 1.  Fundomate did not breach this term for two reasons.

First, this term is too vague and indefinite to be enforceable.  *See Scott v. Pac. Gas & Elec. Co.*, 11 Cal. 4th 454, 466–67 (1995); *Moncada v. W. Coast Quartz Corp.*, 221 Cal. App. 4th 768, 777–79 (2013).  The Offer Letter did not define the terms "milestones" or "funding," and Plaintiff failed to offer evidence sufficient for the court to interpret them.  *See Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343

(2004) (parol evidence is admissible to interpret contract terms which are "reasonably susceptible" to interpretation).

Second, even assuming Fundomate attained the requisite "milestones" or "funding," Fundomate had discretion to award a bonus. Addendum at 1 ("If the Company achieves certain milestones … it *may* decide to also reward [Plaintiff] with a Performance Bonus ….") (emphasis added).

For these reasons, Fundomate did not breach this term of the First Contract.

### 3.    Paid Time Off ("PTO")

"[W]henever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served[.]" Cal. Lab. Code § 227.3. "[T]he wages earned and unpaid at the time of discharge are due and payable immediately." *Id.* § 201(a); *see also Singh v. Southland Stone, U.S.A., Inc.*, 186 Cal. App. 4th 338, 363 (2010) ("[A]n employer is required to pay the amount of wages due, including vacation pay, immediately upon the discharge of an employee ….") (citations omitted).

Plaintiff was entitled to two weeks of PTO for each calendar year. Offer Letter § 3. He did not take any time off. Day 1 Tr. at 45:20–23, 115:6–9. He was employed for six months and, thus, accrued one week (seven days) of PTO. When he was terminated, Plaintiff did not receive any compensation for these seven days of unused PTO. Accordingly, Fundomate breached this term.

Plaintiff's rate of compensation at the time of his termination was $721.1538 per day ($93,750 per six months / 26 weeks per six months / 40 hours per week * 8 hours per day). Addendum; *see Drumm v. Morningstar, Inc.*, 695 F. Supp. 2d 1014, 1019–21 (N.D. Cal. 2010) (explaining calculation of daily wage rate). Seven days at this rate amounts to $5,048.08 (7 days * $721.1538 per day).

The court, thus, FINDS Fundomate breached the First Contract and AWARDS

Plaintiff $5,048.08 for unpaid PTO.

### 4. Equity

Plaintiff's equity would begin to vest "after 12 months of continuous service." Offer Letter § 4. This term was not modified by the Addendum. Because Plaintiff did not complete 12 months of continuous service, he was not entitled to any equity. *Id.* Accordingly, Fundomate did not breach this term of the First Contract.

### 5. Work from Home

Plaintiff was entitled to work from his home in Reno, Nevada, and required to come into Fundomate's office only "as necessary." Offer Letter § 1. After Plaintiff's employment began, Fundomate required Plaintiff to work from its office substantially more than "necessary," particularly in light of the COVID-19 pandemic. *See supra* Findings of Fact § III.C. Fundomate, thus, breached this term of the First Contract.

Plaintiff presented no evidence regarding damages arising from this breach and represented he was not seeking damages for the costs to rent a home in and commute to Los Angeles. Day 2 Tr. at 321:2–322:9 (Plaintiff's counsel: "The apartment and the travel cost from Reno to Beverly Hills, no, we are not seeking damages for those exact amounts."). Plaintiff also does not request any damages for this breach in his post-trial memorandum. Pl.'s Mem. at 14–16

The court, therefore, FINDS Fundomate breached this term of the First Contract, but awards no damages to Plaintiff.

### 6. Health Insurance and Benefits

Pursuant to the Offer Letter:

3. **Employee Benefits.** Employee shall be eligible to receive and to participate in programs for fringe benefits as the Company may make available generally to its employees from time to time during the Employment Term. This includes enjoying all Federal Holidays as Paid Time Off (PTO), as well as 2 weeks of PTO in each calendar year. Employee shall be responsible for making any generally applicable employee contributions required under such fringe benefit programs. The Benefits shall be available to Employee within 90 days of

employment (no later than August 4, 2020).

Offer Letter § 3.  The Offer Letter does not define the terms "fringe benefits" or
"Benefits."  *Id.*  Fundomate did not offer any benefits to its employees when
Plaintiff's employment began.  Day 1 Tr. at 36:14–20, 170:1–12; Day 2 Tr. at 440:4–
441:2, 454:21–22.

Based on the evidence presented at trial, the court interprets "Benefits" to
include health insurance.  *See Casa Herrera*, 32 Cal. 4th at 343 (parol evidence is
admissible to interpret contract terms which are "reasonably susceptible" to
interpretation).  Plaintiff and Schapiro testified they intended Fundomate would offer
health insurance to Plaintiff.  They dispute only who was responsible for installing the
employer-sponsored health plan.  *Compare* Day 1 Tr. at 170:1–12:

> Q:  …  [Schapiro] asked you to get [an employer sponsored health plan]
> in place, right?
>
> Plaintiff: No.  I mean, I wanted the plan.  Had [Schapiro] asked me, I
> would have put it in place in about a day.  I put them in place for eight
> other companies.  I asked him repeatedly, as did all of his nine
> employees—look, [everybody] want[ed] health insurance especially
> during COVID.  They'd all begged for it.  [Schapiro] wouldn't do it.  He
> didn't want to pay for it.  I didn't find that out till I got there.

*with* Day 2 Tr. at 440:4–441:2:

> Schapiro: [Health insurance] was something [Plaintiff] was supposed to
> set up as chief operating officer, as part of leading the company, setting
> up insurance, hiring employees, setting up the payroll system, giving
> insurance to everybody in the company.  …  I wasn't supposed to set it
> up.  That was something we discussed.  I'm happy to give it to you when
> you set it up.  It takes 90 days to do it?  Sure.  That's why we put in the
> extra 90 days.  He said, 'I can get it set up.'  He never did it.

The court finds Fundomate was required to offer health insurance to Plaintiff
and breached this term of the First Contract by failing to do so.  Offer Letter § 3.
Fundomate, not Plaintiff, was required to "make available" the benefits.  *Id.*  In
contrast, Plaintiff was "eligible to receive and to participate in programs" for the

28

benefits and "responsible for making any generally applicable employee contributions required under such" benefit programs. *Id.* Plaintiff was not required under the First Contract to implement an employer-sponsored health plan.

Plaintiff, however, did not submit any evidence regarding damages arising from this breach or request related damages in his post-trial briefing. Pl.'s Mem. at 14–16.

For these reasons, the court FINDS Fundomate breached this term of the First Contract, but awards no damages.

### 7.    Performance Evaluation and Objectives

Fundomate was required to set forth the objectives for earning a performance bonus "before year-end for the calendar year and reporting period[.]" Offer Letter § 2b. Fundomate terminated Plaintiff before the end of the calendar year, so its obligation to set forth these objectives was not triggered. *See id.* § 2b. Fundomate, therefore, did not breach this term of the First Contract.

Fundomate was also required to "provide additional information about the objectives and policies and general employment conditions, including a comprehensive employment agreement," within the first week of employment. *Id.* at 3. Fundomate failed to provide Plaintiff with this information during his employment and, therefore, breached this term of the First Contract.

Plaintiff did not submit any evidence regarding damages arising from this breach or request related damages in his post-trial briefing. Pl.'s Mem. at 12–16.

For these reasons, the court FINDS Fundomate breached this term of the First Contract, but does not award any damages.

### 8.    Bonus for Sourcing Warehouse Line of Credit

Plaintiff was entitled to a 1.5% bonus of the amount of any warehouse line of credit he sourced if the line of credit exceeded $25 million. Ex. 4. Plaintiff sourced a warehouse line of credit from Revere Bank in the amount of $25 million. *See supra* Findings of Fact § III.A.1.b. Upon Fundomate's request, Revere Bank had the ability to increase the amount to $50 million, but as of the date of trial, Revere Bank had not

agreed to any increase.  *See id.*  Because the line of credit did not exceed $25 million, Fundomate's obligation to pay Plaintiff a bonus was not triggered.  Fundomate, thus, did not breach the Second Contract.

### D.    Conclusion

In sum, the court FINDS Fundomate liable for breach of contract and AWARDS Plaintiff $5,048.08 in economic damages.

## III.    Fraudulent Inducement

### A.    Vicarious Liability

Plaintiff brings this claim against Schapiro and Fundomate.  With respect to the allegations underlying this claim, the court finds Schapiro was acting within the scope of his duties as the Chief Executive Officer of Fundomate, and, therefore, finds Fundomate liable for any harm caused by Schapiro's actions.  *See* CACI No. 3703.

### B.    Intentional Misrepresentation vs. False Promise

The parties submit CACI No. 1900 (titled, "Intentional Misrepresentation") as the relevant instruction.  Based on Plaintiff's theory of liability, however, this instruction is inapplicable.  An intentional misrepresentation must relate to a "*past or existing material fact*[.]"  *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (2014) (emphasis added) (citation omitted); *see also* CACI No. 1900, Element 1 (plaintiff must prove defendant "represented to plaintiff that a fact was true").

Here, Plaintiff alleges Schapiro made promises he did not intend to keep.  Pl.'s Mem. at 16–17 ("[Schapiro] represented that [Plaintiff] would be compensated with the Base Salary, Bonus Compensation, Equity Compensation, and Benefits set forth in the Offer Letter.  …  [Schapiro]'s actions demonstrate he … never intended to follow through with his promises.").  The applicable instruction, therefore, is CACI No. 1902, titled, "False Promise."  *See* Cal. Civ. Code § 1572(4); *Missakian v. Amusement Indus., Inc.*, 69 Cal. App. 5th 630, 640 (2021) ("We understand the claim of fraudulent inducement and promissory fraud to be the same.") (citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) ("An action for promissory fraud may lie

1    where a defendant fraudulently induces the plaintiff to enter into a contract.")).

2         The court, thus, utilizes CACI No. 1902.

3    **C.    Liability**

4         To establish this claim against Schapiro and Fundomate, Plaintiff must prove

5    that: (1) Schapiro made a promise to Plaintiff; (2) Schapiro did not intend to perform

6    this promise when he made it; (3) Schapiro intended that Plaintiff rely on this

7    promise; (4) Plaintiff reasonably relied on Schapiro's promise; (5) Schapiro did not

8    perform the promised act; (6) Plaintiff was harmed; and (7) Plaintiff's reliance on

9    Schapiro's promise was a substantial factor in causing Plaintiff's harm.  *Id.*

10                  **1.    False Promise**

11        Schapiro made two promises he did not intend to perform and, in fact, did not

12   perform.

13        First, Schapiro promised Plaintiff he could work remotely, but "[a]bout a week

14   after" Plaintiff's employment began, Schapiro demanded Plaintiff be in the office.

15   Day 1 Tr. at 33:22–36:9.  Schapiro's fraudulent intent is demonstrated by the fact he

16   immediately reneged on the promise.  His intent is further evidenced by his testimony

17   that: he was "lax[]" regarding Plaintiff's requirement to come to the office; he

18   repeatedly asked Plaintiff to come into the office; he did not think Plaintiff could

19   perform if he were not in the office; and he felt Plaintiff was not in the office enough.

20   Day 2 Tr. at 320:4–5 (Schapiro: "He was never obligated to come to the office, even

21   though I asked him a lot; that it would be good for culture.  … [I]n my opinion at that

22   time, it was pretty difficult to build the company culture remotely and engage with

23   people and get to know a business over Zoom.  So I advocated."), 328:4–5 (Schapiro:

24   "He was always on the road.  But then he would never show up to the office."),

25   347:15 (Schapiro: "[H]e's never here."), 443:1–2 (Schapiro: "I [was] lax[] on when he

26   showed up to the office.").

27        While Schapiro claimed Plaintiff was never in the office, the court credits

28   Plaintiff's testimony to the contrary.  *Id.* at 454:8–13 (Plaintiff: "You heard [Schapiro]

31

testify that I was always in the car.  I came into the office in the mornings.  He was

never in the office in the mornings because he was praying.  I was in there in the

mornings, and these guys didn't come in the office until they're done with prayers at

10:30, 11:00, whenever they came in.  I was in the office all the time.  I'm an early-

morning guy.  …  Wake up at 5:00 a.m.  I go to the gym, and I go to work, and I'm

done.  If you looked at the card swipes on the door, you'd see I was in the office all

the time.  They were just never there.").

Second, Schapiro promised Plaintiff health insurance, but never intended to

provide that benefit because he did not want to pay for it.  Day 1 Tr. at 170:1–12

(Plaintiff: "I asked him repeatedly [for health insurance], as did all of his nine

employees—look, [everybody] want[ed] health insurance especially during COVID.

They'd all begged for it.  [Schapiro] wouldn't do it.  He didn't want to pay for it.  I

didn't find that out 'til I got there.").  Schapiro blames Plaintiff for failing to set up a

health plan, but the court credits Plaintiff's testimony that Schapiro never asked him

to, and, as described, it was Fundomate's obligation to offer health insurance—not

Plaintiff's.  *See supra* Conclusions of Law § II.C.6.

Schapiro's unwillingness to pay his obligations was a pattern.  He attempted to

avoid paying Piotrowski despite having entered into a contract.  Day 1 Tr. at 100:3–6

(Plaintiff: "[Schapiro] was pushing back on paying [] Piotrowski who was already in a

contract, saying he didn't want to pay him what was in the contract that we had

signed."), 152:23–153:2 ("Q: Isn't it true that you reached out to [Plaintiff] around

November 1, 2020, to say, 'Hey, this really needs to get paid.  We're doing a lot of

work here, and we still haven't gotten paid'?  Piotrowski: Yes.").  Schapiro also

delayed issuing equity in Fundomate to Bareket—his business partner of ten years and

Fundomate's co-founder—to the point where Bareket was about to take legal action.

*Id.* at 115:25–116:3 (Plaintiff: "[Bareket], the co-founder, told me in a phone

conversation after [I was terminated that, after] ten years of being there, he had never

gotten his stock in writing, and he was about to hire a lawyer to sue [Schapiro] to get

it in writing."), 260:1–262:16 ("Q: Did you ever … have to make a threat to
[Schapiro] that you were going to file suit if you did not reach a resolution?  Bareket: I
don't remember doing.  I don't remember.  Q: Is it possible?  Bareket: I don't think I
say to him directly.").

The first, second, and fifth elements are met.

### 2.    Intent

Schapiro intended Plaintiff rely on these promises so that Plaintiff would join
Fundomate.  The third element is met.

### 3.    Reasonable Reliance

Schapiro's promises of health benefits and the ability to work from home
substantially influenced Plaintiff to join Fundomate, and Plaintiff likely would not
have joined Fundomate in the absence of those promises, especially given his son's
serious illness at the time and the ongoing COVID-19 pandemic.  *See* CACI No.
1907; *supra* Findings of Fact § III.C.  A reasonable person in Plaintiff's position
would have found the promises important in deciding whether to join Fundomate.  *See*
CACI No. 1908.  It is reasonable to conclude Plaintiff would have turned down
employment with Fundomate if it did not offer health insurance or the ability to work
from home.

Lastly, Plaintiff relied reasonably on Schapiro's promises.  *See id.*  The
promises were not extravagant, and, based on Plaintiff's previous work with Schapiro
when Plaintiff was employed at Poynt, reasonably believed Schapiro.  Day 1 Tr.
at 23:10–24:9, 26:21–27:24, 28:21–29:4.

The fourth element is met.

### 4.    Harm and Causation

Plaintiff was harmed by Schapiro's false promises, and Plaintiff's reliance on
those promises was a substantial factor in causing Plaintiff's harm.  Plaintiff was
never offered health insurance and was required to commute to Los Angeles to work
in the office.  The sixth and seventh elements are met.

33

1              **5.**     **Conclusion Regarding Liability**

2        For these reasons, the court FINDS Fundomate and Schapiro liable for

3 fraudulent inducement.

4     **D.**     **Damages**

5           **1.**     **Economic Damages**

6        Plaintiff does not quantify the damages he seeks for his fraudulent inducement

7 claim or explain how the court should calculate those damages.  Pl.'s Mem. at 20.  He

8 merely refers the court, without explanation, to the damages he seeks for breach of

9 contract.  *Id.* ("See Damages calculations, <u>supra</u>., under Breach of Contract").

10 Plaintiff, however, cannot recover these contractual damages on his fraudulent

11 inducement claim because they are "benefit-of-the bargain" damages, as explained

12 below.

13              **a.**     **Benefit-of-the-Bargain Damages**

14        In general, the measure of damages "for the breach of an obligation not arising

15 from contract … is the amount which will compensate for all the detriment

16 proximately caused thereby, whether it could have been anticipated or not."  Cal. Civ.

17 Code § 3333.  Under Cal Civ. Code § 1709, a person "who willfully deceives another

18 with intent to induce him to alter his position to his injury or risk, is liable for any

19 damage which he thereby suffers."

20        "There are two measures of damages for fraud: out-of-pocket and benefit of the

21 bargain."  *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) (citation

22 omitted).  "The 'out-of-pocket' measure of damages is directed to restoring the

23 plaintiff to the financial position enjoyed by him prior to the fraudulent transaction,

24 and thus awards the difference in actual value at the time of the transaction between

25 what the plaintiff gave and what he received."  *Id.* (citations omitted).  "The 'benefit-

26 of-the-bargain' measure, on the other hand, is concerned with satisfying the

27 expectancy interest of the defrauded plaintiff by putting him in the position he would

28 have enjoyed if the false representation relied upon had been true; it awards the

difference in value between what the plaintiff actually received and what he was
fraudulently led to believe he would receive." *Id.* (citations omitted).

"In California, a defrauded party is ordinarily limited to recovering his 'out-of-pocket' loss." *Id.* (cleaned up).  The out-of-pocket measure "has been termed more
consistent with the logic and purpose of the tort form of action (*i.e.*, compensation for
loss sustained rather than satisfaction of contractual expectations)." *Stout v. Turney*,
22 Cal. 3d 718, 725 (1978) (citations omitted) (*en banc*).  The benefit-of-the-bargain
rule is viewed as closer to a contractual remedy, *i.e.*, "it tends to give the injured party
the benefit of his bargain and insofar as possible to place him in the same position he
would have been in had the promisor performed the contract." *Pepitone v. Russo*, 64
Cal. App. 3d 685, 689 (1976) (citations omitted).

District courts applying California law in this circuit have determined benefit-of-the-bargain damages cannot be recovered on a fraud claim, with the possible
exception of fraud by a fiduciary. *EduMoz, LLC v. Republic of Mozambique*, Case
No. 13-cv-02309-MMM (CWx), 2015 WL 13697385, at *14 (C.D. Cal. Apr. 20,
2015) ("[Plaintiff]'s fraudulent misrepresentation … claim must be dismissed to the
extent it seeks damages premised on the benefit of the bargain set forth in the
[contract]. … Courts applying California law generally agree that, with the possible
exception of fraud by a fiduciary, [Cal. Civ.] Code §§ 1709 and 3333 do not permit
recovery of benefit-of-the-bargain damages.") (collecting cases); *S. Union Co. v. Sw.
Gas Corp.*, 180 F. Supp. 2d 1021, 1037–41 (D. Ariz. 2002) ("[Plaintiff] may not
recover benefit-of-the-bargain damages on its fraudulent inducement claim under the
majority view of California courts."); *City Sols., Inc. v. Clear Channel Commc'ns,
Inc.*, 242 F. Supp. 2d 720, 726–32 (N.D. Cal. 2003), *aff'd in part, rev'd in part sub
nom. City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835 (9th Cir. 2004).

In *City Solutions*, after conducting a detailed analysis of the history of fraud
damages under California law, the court concluded:

1
2
3
4
5
6
7
8
9
10

> To summarize, fraud actions allow recovery for all loss proximately caused by detrimental reliance on a fraud. Where a victim would have earned profits had it not relied to its detriment on a fraud, then the victim may recover lost profits. This is true as well where the fraud happens to be a false promise. But the victim cannot go further and hold the wrongdoer to its promise. A jury cannot award the victim the benefit of the bargain, for to do so would leap beyond the scope of detrimental reliance and would award contract damages. In fraudulent-promise cases, the temptation will loom large to hold the fraudulent promisor to its promise and thereby transgress this distinction. The temptation must be resisted. In a fraud case, we must always return to the key question—how did the victim actually rely to its detriment on the false promise. Or, put differently, how would the outcome have differed had the false promise not been made or relied upon.

11

*Id.* at 732.[5]

12

The California Supreme Court, however, in a passage *City Solutions* describes

13

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

[5] In one unpublished opinion, the California Court of Appeal held that benefit-of-the-bargain damages were properly awarded on a promissory fraud claim. *Cupps v. Mendelson*, Case No. D052869, 2010 WL 1366996, at *4–6 (Cal. Ct. App. Apr. 7, 2010). The defendant in *Cupps* promised the plaintiff 40% ownership of a company. *Id.* at *5. The jury found the defendant liable for promissory fraud—but not breach of contract—and, pursuant to a benefit-of-the-bargain instruction, compensated the plaintiff with 40% ownership. *Id.* at *1, 5. On appeal, the defendant argued the "exclusive measure for damages for promissory fraud is out-of-pocket damages," but the court held this was "an incorrect understanding of applicable law" because, under Cal. Civ. Code § 3333, a court "has discretion and flexibility to instruct a jury on an award that will appropriately compensate the plaintiff for the detriment caused by the defendant's tortious conduct." *Id.* at *4–5 (citations omitted); *see also Strebel v. Brenlar Invs., Inc.*, 135 Cal. App. 4th 740, 749 (2006) ("There is "no fixed rule for the measure of tort damages under Cal. Civ. Code [§] 3333. The measure that most appropriately compensates the injured party for the loss sustained should be adopted.") (citation omitted); *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 599 (1970) ("It is within the sound discretion of the trier of fact to select the formula most appropriate to compensate the injured party."). The court held the plaintiff in *Cupps* was "entitled to seek the value of the benefits he would have received if the representations as to ownership by [the defendant] had been true, *i.e.*, that he was a 40[%] owner of the corporation entitling him to the benefits of this ownership." *Cupps*, 2010 WL 1366996, at *5.

36

as "confusing," 242 F. Supp. 2d at 730 n. 6, stated that a "fraud plaintiff may recover

out-of-pocket damages *in addition to* benefit-of-the-bargain damages," *Lazar*, 12 Cal.

4th at 646 (emphasis added) (internal quotation marks removed).  In *Lazar*, the

plaintiff employee was induced to leave his prior employment by the defendant

employer, who then terminated plaintiff.  *Id.* at 635–37.  The plaintiff brought claims

for, *inter alia*, breach of contract and promissory fraud.  *Id.* at 637.  The court

concluded that, "as to [plaintiff's] *fraud* claim [he] may properly seek damages for the

costs of uprooting his family, expenses incurred in relocation, and the loss of security

and income associated with his former employment in New York … however,

[Plaintiff] must rely on his *contract* claim for recovery of any loss of income allegedly

caused by wrongful termination of his employment."  *Id.* at 648–49 (emphases in

original).

　　*Lazar*'s statement that a fraud plaintiff may recover both out-of-pocket and

benefit-of-the-bargain damages has confused litigants and courts.  *See, e.g.*, *In re

Ifeorah*, Case No. 13-01048, 2015 WL 3895502, at *6 (B.A.P. 9th Cir. June 24,

2015), *aff'd in part, rev'd in part*, 683 F. App'x 621 (9th Cir. 2017) ("According to

[debtor], California law permits fraud victims to recover in civil actions 'out-of-pocket

losses,' but does not permit them to recover the 'benefit of the bargain.'  We are

perplexed by [debtor]'s citation to *Lazar*.  The California Supreme court explicitly

stated that, in appropriate cases, 'fraud plaintiffs may recover out-of-pocket damages

in addition to benefit-of-the-bargain damages.") (cleaned up).  It is reasonably clear,

however, based on a later California Supreme Court opinion and courts interpreting

*Lazar*, that *Lazar* did not intend to create recovery of benefit-of-the-bargain damages

for fraud claims.  *See Simon v. San Paolo U.S. Holding Co.*, 35 Cal. 4th 1159, 1176

n. 4 (2005) ("[Plaintiff] cites our decision in *Lazar*[] for the proposition that fraud

plaintiffs generally may recover benefit-of-bargain as well as out-of-pocket damages.

*The reliance is misplaced: our reference in that decision to benefit-of-bargain*

*damages was to their recovery under a contract cause of action*.") (emphasis added).[6]

This court agrees with the analysis, reasoning, and conclusions of *City Solutions* and *Southern Union* and holds that, under California law, a fraud plaintiff cannot recover benefit-of-the-bargain damages, with the possible exception of fraud by a fiduciary. Plaintiff, thus, cannot recover the benefit of the bargain set forth in the Contracts.

### b.    Applying the Out-of-Pocket Rule

Although Plaintiff does not expressly request out-of-pocket damages, he submits some evidence supporting such damages. *See City Sols.*, 242 F. Supp. 2d at 732 ("[T]he key question … [is] how would the outcome have differed had the false promise not been made or relied upon."). Specifically, Plaintiff testified he was on the verge of accepting an offer from Fiserv and would be compensated with a base salary of roughly $475,000, a bonus, and equity:

> Plaintiff: I had a great network of folks, so I was talking to many folks about opportunities. One of them that was really materializing was with a company called Fiserv[.] … I was talking to [two persons at Fiserv

---

[6] *See also City Sols.*, 242 F. Supp. 2d at 730 & n. 6 ("[I]n the case of this promissory fraud [in *Lazar*], the plaintiff was entitled to recover his out-of-pocket expenses under [§] 3333: the costs of uprooting his family, his expenses incurred in relocation and the loss of future income associated with his former employment. Plaintiff also was entitled to recover his benefit-of-the-bargain—the loss of income caused by the termination—but *those* damages were based on his *contract* claim.") (emphases in original); *Los Angeles Cmty. Coll. Dist. v. Roosevelt Lofts, LLC*, Case No. B266057, 2016 WL 6875919, at *9 (Cal. Ct. App. Nov. 22, 2016) ("[V]iewed in context, the *Lazar* proposition means only that a party asserting fraud and breach of contract claims may, in suitable circumstances, recover out-of-pocket damages for fraud and benefit-of-the bargain damages for breach of contract, not that a defrauded party may recover both benefit-of-the bargain and out-of-pocket damages for fraud."); *Roberts v. Redlands Centennial Bank*, Case No. E028775, 2002 WL 1529614, at *11 (Cal. Ct. App. July 15, 2002) ("Relying on the above language in *Lazar*, [plaintiff] argues that she is entitled to both out-of-pocket and benefit-of-the-bargain damages. She is wrong. The plaintiff in *Lazar* was entitled to seek both types of damages because he had both contract and tort claims.").

who] reported to the CEO.  They were talking to me about big operating roles, and I got into a discussion where [we] were talking about base salary and compensation.  Little did I know that [one of them] was about to retire, and his intention was that I would replace him.  And those are huge jobs, 10, 15 million in compensation annually.  So I didn't realize it at the time, but he couldn't tell me.  But [] he would talk about a base salary of roughly 475-ish and a bonus that would have been higher than that and then equity.  So I was in a point where they were talking verbally what the cash would be.

…

Q: Did you ever get a written employment offer from Fiserv[]?

Plaintiff: No, only verbal.  I had told [Schapiro] that I was on the verge of it, and I needed to make a decision.  And I ultimately decided to go the route of [Fundomate] before I took a written offer from Fiserv.  [] I knew these people really well.  I wasn't about to take a written offer and not accept it.  That's not the way I operate.  So I told them that I was engaged with another party and that I was going to pass.  But I verbally had been offered an amount.").

Day 1 Tr. at 22:1–23:9, 169:9–18.

The question here is whether the compensation Plaintiff would have earned at Fiserv was proven with "reasonable certainty." *Southern Union*, 180 F. Supp. 2d at 1035 (citing *Mann v. Jackson*, 141 Cal. App. 2d 6, 12 (1956) ("It is well established that damages may be awarded for loss of profits where such profits can be shown with a reasonable degree of certainty, whether the action be for tort or for breach of contract.")).  For example, in *Helmer v. Bingham Toyota Isuzu*, 129 Cal. App. 4th 1121, 1124, 1128–31 (2005), the plaintiff employee was induced to leave his prior employment by the defendant employer, who later terminated him.  The plaintiff prevailed on his promissory fraud claim and was able to recover damages for lost wages based on what he would have earned had he stayed with his former employer.  *Id.*  The plaintiff's former employer testified plaintiff was a "good" and "reliable" employee, and that he was sad to see plaintiff go and would have re-hired plaintiff but for a strict company no-rehire policy.  *Id.* at 1124, 1131.  Based on this evidence, the

1   plaintiff was able to recover future lost wages during the time period from the date he
2   started working for the defendant employer through his estimated future retirement at
3   the age of 61. *Id.* at 1127, 1131 ("This testimony establishes that, had [plaintiff] not
4   been induced to leave his employment … due to the false promise made by
5   [defendant] regarding his salary, [plaintiff] would have remained employed at [his
6   former employer]. … [T]he damages are neither speculative nor remote.").

7       In contrast, in *Toscano v. Greene Music*, 124 Cal. App. 4th 685, 695–97 (2004),
8   the plaintiff employee was induced to leave his employment by the defendant
9   employer, who then reneged on the employment offer after plaintiff had resigned from
10  his former employer. The plaintiff prevailed on his promissory estoppel claim, but
11  was not able to recover damages for lost wages based on what he would have earned
12  had he stayed with his former employer. The plaintiff did not establish he had a
13  "definite expectation of continued employment with [his former employer] for any
14  period of time"—much less until his retirement—as he was an at-will employee and
15  his former boss did not testify. *Id.* at 696. The court, thus, vacated the jury's award of
16  lost wages from 2001 through the date of his retirement in 2017. *Id.* at 697.

17      Here, like *Toscano*, an award of damages based on Plaintiff's potential
18  employment with Fiserv is too speculative. First, it is possible Plaintiff would never
19  have joined Fiserv irrespective of Fundomate. Second, even if Plaintiff had joined
20  Fiserv, it is unclear when he would started to work there. Third, the terms of the offer
21  were not clearly defined. The compensation included a base salary of "roughly 475-
22  ish," an undefined bonus, and undefined equity. Day 1 Tr. at 23:6–8. Fourth, Plaintiff
23  did not establish he had a definite expectation of continued employment at Fiserv for
24  any period of time. No one from Fiserv, for example, testified Plaintiff could have
25  expected to be employed for any period of time.

26      Lastly, Plaintiff did not present any evidence regarding out-of-pocket damages
27  for commuting to Los Angeles or the cost of health insurance he was required to
28  purchase on his own or any medical costs he incurred due to the lack of health

1    insurance.

2          The court, therefore, does not award Plaintiff any economic damages for his

3    fraudulent inducement claim.

4                    **2.    Noneconomic Damages**

5          Noneconomic loss, such as mental suffering, may be recovered pursuant to a

6    claim for false promise.  *See* CACI No. VF-1902; *Nagy v. Nagy*, 210 Cal. App. 3d

7    1262, 1269 (1989).[7]  "[T]here is no fixed or absolute standard by which to compute

8    the monetary value of emotional distress, and a jury is entrusted with vast discretion in

9    determining the amount of damages to be awarded."  *Plotnik v. Meihaus*, 208 Cal.

10   App. 4th 1590, 1602 (2012) (cleaned up); *see also* CACI No. 3905A ("No fixed

11   standard exists for deciding the amount of these noneconomic damages.  You must

12   use your judgment to decide a reasonable amount based on the evidence and your

13   common sense.").  Emotional distress damages must be supported by sufficient

14   evidence, but "the testimony of a single person, including the plaintiff, may be

15   sufficient to support an award of emotional distress damages."  *Knutson v. Foster*, 25

16   Cal. App. 5th 1075, 1096 (2018) (emphasis removed).

17         Plaintiff suffered substantial mental and emotional distress from being induced

18   to join Fundomate by false promises of health benefits and the ability to work

19   remotely given his son's serious illness at the time and the ongoing pandemic.  *See*

20   *supra* Findings of Fact § III.C.  The court, therefore, AWARDS Plaintiff $100,000 in

21   emotional distress damages.

22   / / /

23

------

24   [7] *Nagy* explains emotional distress damages may be recovered "only as an aggravation

25   of other damages."  210 Cal. App. 3d at 1269 (citations omitted).  Here, while the court does not award Plaintiff economic damages for fraudulent inducement because

26   Plaintiff failed to establish them with reasonable certainty, the court finds Plaintiff

27   suffered emotional distress arising from some amount of economic damages, including for lack of health insurance and being required to commute to Los Angeles

28   and work in person at Fundomate's office.

**E.    Conclusion**

In sum, the court FINDS Schapiro and Fundomate liable for fraudulent inducement, and AWARDS Plaintiff $100,000 in noneconomic damages.

**IV.    Religious Discrimination in Employment in Violation of FEHA**

Plaintiff claims Fundomate wrongfully discriminated against him.  To establish this claim against Fundomate, Plaintiff must prove that: (1) Fundomate was an employer; (2) Plaintiff was an employee of Fundomate; (3) Fundomate subjected Plaintiff to an adverse employment action; (4) Plaintiff's religious beliefs were a substantial motivating reason for Fundomate's adverse employment action; (5) Plaintiff was harmed; and (6) Fundomate's conduct was a substantial factor in causing Plaintiff's harm.  CACI No. 2500.

Plaintiff argues the "termination of his employment and the denial of promised compensation" were adverse employment actions taken by Fundomate, and that Plaintiff's religious beliefs were a substantial motivating reason for these actions. Pl.'s Mem. at 24.  The court disagrees.  Plaintiff's religion was not a substantial motivating reason for his termination.  The only promised compensation Fundomate did not pay was for PTO, *see supra* Conclusions of Law § II.C, and Fundomate's nonpayment of PTO was not substantially motivated by Plaintiff's religious beliefs.

The court, therefore, FINDS Fundomate not liable for religious discrimination in employment in violation of FEHA.

**V.    Religious Harassment in Employment in Violation of FEHA**

Plaintiff claims both Schapiro and Fundomate subjected him to harassment based on his religious beliefs and this harassment created a work environment that was hostile, intimidating, offensive, oppressive, or abusive.  CACI No. 2521A.

**A.    Schapiro**

To establish this claim against Schapiro, Plaintiff must prove he was an employee of Schapiro.  *Id.*  Plaintiff, however, was not Schapiro's employee.  He was Fundomate's employee, as Plaintiff acknowledges.  Pl.'s Mem. at 1 n. 1.

The court, therefore, FINDS Schapiro not liable on this claim.

**B.    Fundomate**

To establish this claim against Fundomate, Plaintiff must prove: (1) he was subjected to harassing conduct because of his religious beliefs; (2) the harassing conduct was severe or pervasive; (3) a reasonable person in his circumstances would have considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive; (4) he considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive; (5) a supervisor engaged in the conduct; (6) Plaintiff was harmed; and (7) the conduct was a substantial factor in causing Plaintiff's harm.  CACI No. 2521A.

**1.    Harassing Conduct Because of Religious Beliefs**

Plaintiff was subjected to harassing conduct because he was Christian.  After Plaintiff revealed his maternal grandmother was Jewish, Schapiro encouraged Plaintiff to put on tefillin and convert to Judaism on numerous occasions and demanded Plaintiff do so if he wanted to receive a bonus or remain employed.  *See supra* Findings of Fact §§ III.A.1.a, III.E; Day 1 Tr. at 112:13–113:18; Day 2 Tr. at 413:16–23, 414:25–415:5, 452:9–453:15; Trial Ex. 4.[8]  Schapiro also demanded Plaintiff refrain from working during Shabbat, but would call Plaintiff on Sundays to discuss work.  Day 1 Tr. at 112:13–113:20, 116:10–14.

The first element is met.

**2.    Severe or Pervasive**

"'Severe or pervasive' means conduct that alters the conditions of employment and creates a work environment that is hostile, intimidating, offensive, oppressive, or abusive."  CACI No. 2524.  The court considers: (1) the nature of the conduct; (2) how often, and over what period of time, the conduct occurred; (3) the

---

[8] Even if the emails between Plaintiff and Defendant regarding a line of credit bonus were not sufficiently authenticated, Trial Ex. 4, ample additional evidence supports Plaintiff was harassed because of his religious beliefs.

circumstances under which the conduct occurred; (4) and whether the conduct was physically threatening or humiliating.  *Id.*  Plaintiff does not have to prove his productivity declined.  *Id.*  It is sufficient to prove a reasonable person who was subjected to the harassing conduct would find the conduct so altered working conditions as to make it more difficult to do the job.  *Id.*  A single incident can be sufficiently severe or pervasive to constitute harassment.  *Id.*

Here, Schapiro's harassing conduct was severe and pervasive.  As described, Plaintiff was expected and required to participate in Jewish rituals if he wanted to remain employed or receive a bonus.  The conduct began within two months of Plaintiff's employment and continued throughout.  Schapiro's comments and demands spanned in-person conversations, telephone calls, and text messages.  During Shabbat, Schapiro forbid Plaintiff from working, not only on Fundomate tasks, but on anything, including personal matters.  The conversation in Schapiro's office was a sufficiently severe incident, alone, to constitute harassment.  Day 2 Tr. at 452:9–453:15.  Because of Schapiro's conduct, a reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile, intimidating, offensive, oppressive, and abusive.

The second and third elements are met.

### 3.    Harm and Causation

Plaintiff, in fact, considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive, and he was harmed.  *See* Day 1 Tr. at 113:9–20; Day 2 Tr. at 453:10–13 ("Q: And did you consider [Schapiro]'s attitude towards religion and his conduct towards religion to be emotionally distressing for you?  A. It was.").  Lastly, Schapiro was Plaintiff's supervisor, *see* CACI No. 2525, and his conduct was a substantial factor in causing Plaintiff's harm.

The fourth, fifth, sixth, and seventh elements are met.

### 4.    Conclusion Regarding Liability

Accordingly, the court FINDS Fundomate liable for religious harassment in

1  employment in violation of FEHA.

2      **C.**    **Damages**

3          **1.**    **Economic Damages**

4      For FEHA harassment liability, Plaintiff may recover "those damages generally

5  available in noncontractual actions." *State Dep't of Health Servs. v. Superior Ct.*, 31

6  Cal. 4th 1026, 1042 (2003) (cleaned up).  Here, like with respect to Plaintiff's

7  fraudulent inducement claim, Plaintiff does not quantify his damages and, instead,

8  merely refers the court to his contract damages.  Pl.'s Mem. at 24 ("See discussion,

9  <u>supra</u>., re economic damages and emotional distress").  Plaintiff fails to show why he

10  would be entitled to any of the requested contractual damages because he was

11  harassed.  *See id.*  The court, thus, awards no economic damages.

12          **2.**    **Noneconomic Damages**

13      Noneconomic damages may be awarded pursuant to a FEHA harassment claim.

14  *See Roby v. McKesson Corp.*, 47 Cal. 4th 686, 699, 765. (2009), *as modified* (Feb. 10,

15  2010).  The standard for awarding emotional distress damages is set forth above.  *See*

16  *supra* Conclusions of Law § <u>III.D.2</u>.

17      Plaintiff suffered mental and emotional distress from the harassment.  *See* Day

18  2 Tr. at 453:10–13.  The court AWARDS Plaintiff $100,000 in noneconomic

19  damages.

20      **D.**    **Conclusion**

21      In sum, the court FINDS Fundomate liable for religious harassment in

22  employment in violation of FEHA and AWARDS Plaintiff $100,000 in noneconomic

23  damages.

24  **VI.**    **Failure to Prevent Discrimination and Harassment in Violation of FEHA**

25      Plaintiff claims Fundomate failed to take all reasonable steps to prevent

26  discrimination and harassment.  To establish this claim against Fundomate, Plaintiff

27  must prove that: (1) Plaintiff was an employee of Fundomate; (2) Plaintiff was

28  subjected to discrimination or harassment in the course of employment;

(3) Fundomate failed to take all reasonable steps to prevent the discrimination or harassment; (4) Plaintiff was harmed; and (5) Fundomate's failure to take all reasonable steps to prevent discrimination or harassment was a substantial factor in causing Plaintiff's harm.  CACI No. 2527.

For the same reasons set forth above regarding Plaintiff's claim for religious harassment in violation of FEHA, Plaintiff was subjected to harassment during his employment and was harmed.  *See supra* Conclusions of Law § V.B.  The court further finds Fundomate did not take all reasonable steps to prevent harassment against Plaintiff, and this failure was a substantial factor in causing Plaintiff's harm.

Accordingly, the court FINDS Fundomate liable for failure to prevent discrimination and harassment.

The court, however, does not award any damages to Plaintiff, as they would be duplicative of the damages awarded pursuant to Plaintiff's religious harassment claim.  *See supra* Conclusions of Law § V.C; *Roby*, 47 Cal. 4th at 702 ("Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence.") (citation omitted).

In sum, the court FINDS Fundomate liable for failure to prevent discrimination and harassment, but awards no additional damages.

## VII.   Wrongful Termination in Violation of Public Policy

Plaintiff claims that, in violation of public policy, Fundomate terminated him to avoid paying wages owed.  Pl.'s Mem. at 20 (citing *Gould v. Maryland Sound Indus., Inc.*, 31 Cal. App. 4th 1137, 1146–50 (1995), *as modified* (Feb. 9, 1995) ("[I]f [defendant] discharged [plaintiff] in order to avoid paying him the commissions, vacation pay, and other amounts he had earned, it violated a fundamental public policy of this state.").

*Gould* is inapplicable here.  The plaintiff in *Gould* claimed his employer terminated him to avoid paying him wages *he had already earned*.  31 Cal. App. 4th

at 1143.  The public policy at issue was the "prompt payment" of those wages.  *Id.* at 1147.  In contrast, here, Fundomate paid Plaintiff all wages he had earned at the time of termination pursuant to the Contracts, except for PTO.  *See supra* Conclusions of Law at § II.C.  The court finds Fundomate did not terminate Plaintiff to avoid paying him PTO.  *See* CACI No. 2430, Element 3 (Plaintiff must prove a "substantial motivating reason" for his discharge was to avoid paying wages owed).

The court, thus, FINDS Fundomate not liable for wrongful termination in violation of public policy.

**VIII. Waiting Time Penalties (Cal. Labor Code § 203)**

Plaintiff asserts this cause of action against Fundomate.  He claims he is entitled to recover a penalty based on Fundomate's failure to pay his wages after his employment ended.  To establish this claim against Fundomate, Plaintiff must prove: (1) his employment with Fundomate ended; (2) Fundomate willfully failed to pay him all wages when due; (3) his daily wage rate at the time his employment with Fundomate ended; and (4) Fundomate never paid him all wages.  CACI No. 2704; Cal. Labor Code § 203(a).

"As used in [§] 203, 'willful' merely means that the employer intentionally failed or refused to perform an act which was required to be done."  *Nishiki v. Danko Meredith, APC*, 25 Cal. App. 5th 883, 891 (2018) (emphasis removed) (citation omitted).  Willfulness under § 203 does not require "anything blameable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done, was done or omitted intentionally."  *Id.* (citation omitted).  "It amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent."  *Id.* (cleaned up).  The term "wages" means "benefits to which an employee is entitled as a part of his or her compensation, including money, room, board, clothing, vacation pay, and sick pay."  *Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1103 (2007) (citations omitted).  If Plaintiff proves each element of liability, he is entitled to a penalty of up

47

to 30 days' wages.  Cal. Labor Code § 203(a); *Singh*, 186 Cal. App. 4th at 363–64 ("[A]n employer is required to pay the amount of wages due, including vacation pay, immediately upon the discharge of an employee … If the employer willfully fails to pay wages due, the employee is entitled to an additional payment of up to 30 days' wages as a penalty.") (citations omitted).

Plaintiff has demonstrated he is entitled to a waiting time penalty.  Upon Plaintiff's termination, Fundomate owed him $5,048.08 for PTO.  *See supra* Conclusions of Law § II.C.3.  This amount was immediately due and payable when Fundomate terminated Plaintiff.  *Singh*, 186 Cal. App. 4th at 363–64; Cal. Lab. Code § 201(a).  Fundomate willfully failed to pay Plaintiff this amount because it determined Plaintiff was not entitled to any pay when it terminated him, but there is no reasonable dispute compensation for PTO was owed.  *See* Day 1 Tr. at 45:20–46:1, 173:3–14; Day 2 Tr. at 400:3–23, 442:4–443:3; Def.'s Mem. at 15–16; *cf. Choate v. Celite Corp.*, 215 Cal. App. 4th 1460, 1468 (2013) ("an employer's reasonable, good faith belief [] wages are not owed may negate a finding of willfulness").  Plaintiff's daily wage rate at the time of his termination was $721.1538.  *See supra* Conclusions of Law § II.C.3.  Plaintiff, therefore, is entitled to a penalty of $21,634.62 ($721.1538 per day * 30 days = $21,634.62).

In sum, the court FINDS Fundomate liable for waiting time penalties and AWARDS Plaintiff a penalty of $21,634.62.

## IX.    Punitive Damages

"In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Cal. Civ. Code § 3294; *see also* CACI No. 3940 ("The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.").  "'Oppression' means despicable conduct that subjects

a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(2). "'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant [to] depriv[e] a person of property or legal rights or otherwise causing injury." *Id* § 3294(c)(3). "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* § 3294(c)(1).

There is no fixed formula for determining the amount of punitive damages, and the court is not required to award any punitive damages.  CACI No. 3940.  If the court decides to award punitive damages, it considers all of the following factors in determining the amount:

> (a)  How reprehensible was the defendant's conduct?  In deciding how reprehensible the defendant's conduct was, the court may consider, among other factors:
>
>> (i)  Whether the conduct caused physical harm;
>>
>> (ii)   Whether the defendant disregarded the health or safety of others;
>>
>> (iii)  Whether the plaintiff was financially weak or vulnerable and the defendant knew plaintiff was financially weak or vulnerable and took advantage of him;
>>
>> (iv)  Whether the defendant's conduct involved a pattern or practice; and
>>
>> (v)  Whether the defendant acted with trickery or deceit.
>
> (b)  Is there a reasonable relationship between the amount of punitive damages and the plaintiff's harm that the defendant knew was likely to occur because of the defendant's conduct?
>
> (c)  In view of the defendant's financial condition, what amount is necessary to punish him and discourage future wrongful conduct?

*Id.*

"An award should be no larger than the amount necessary to [punish

1  wrongdoers and deter wrongful acts] and therefore must be tailored to the defendant's

2  financial status." *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1593 (1994), *as*

3  *modified* (Nov. 14, 1994), *as modified on denial of reh'g* (Nov. 17, 1994), *as modified*

4  (Nov. 22, 1994); *see also Adams v. Murakami*, 54 Cal. 3d 105, 109 (1991) (*en banc*)

5  ("[A]n award of punitive damages cannot be sustained on appeal unless the trial

6  record contains meaningful evidence of the defendant's financial condition.").

7  Punitive damages "generally are not allowed to exceed 10 percent of the net worth of

8  the defendant." *Michelson*, 29 Cal. App. 4th at 1596 (citation omitted) (finding

9  punitive damages award of 28% of defendant's net worth excessive as a matter of

10  law).

11      Additionally, "few awards exceeding a single-digit ratio between punitive and

12  compensatory damages, to a significant degree, will satisfy due process." *Colucci v.*

13  *T-Mobile USA, Inc.*, 48 Cal. App. 5th 442, 458 (2020) (citation omitted).  "In general,

14  a higher ratio might be necessary where the plaintiff's injury was hard to detect, or the

15  monetary value of noneconomic harm might have been difficult to determine." *Id.*

16  "But when compensatory damages are substantial, then a lesser ratio, perhaps only

17  equal to compensatory damages, can reach the outermost limit of the due process

18  guarantee." *Id.* (cleaned up) (finding 1.5-to-one ratio between punitive and

19  compensatory damages was federal constitutional maximum where compensatory

20  damages were "substantial" ($1,020,042) and comprised primarily noneconomic harm

21  ($700,000)).

22      **A.    Fraud**

23      Punitive damages are warranted for Fundomate and Schapiro's fraudulent

24  inducement.  *See supra* Conclusions of Law § III.C.  Schapiro's conduct was highly

25  reprehensible.  He caused substantial emotional harm to Plaintiff.  He showed little

26  regard for Plaintiff and his family, as he immediately reneged on his promise and

27  ordered Plaintiff to be in the office during the COVID-19 pandemic at a time when his

28  son was seriously ill, while simultaneously refusing to provide the health insurance he

had promised.  He also ordered the other Fundomate employees into the office and failed to provide them health benefits despite their requests.  His unwillingness to pay for medical benefits was part of a pattern of not paying obligations owed.  *Id.*  His promises were intended to benefit himself and Fundomate at Plaintiff's expense—that is, he induced Plaintiff into accepting employment through promises he did not intend to keep and then reaped the benefits of Plaintiff's contributions.

The court finds $200,000 in punitive damages is sufficient but no greater than necessary to punish Fundomate and Schapiro and deter future wrongdoing.  Plaintiff established Fundomate's net worth was $42.5 million.  Day 1 Tr. 79:2–7; Trial Ex. 14. This punitive damages award, thus, constitutes 0.47% of Fundomate's net worth.  The ratio of punitive damages ($200,000) to compensatory damages ($100,000) is two.

### B.    Malice

Punitive damages are also warranted for Fundomate's malicious religious harassment and failure to prevent discrimination and harassment.  *See supra* Conclusions of Law §§ V.B, VI.  Schapiro's conduct, as Fundomate's CEO, was willful and consciously disregarded Plaintiff's right to practice the religion of his choice.  Schapiro's conduct was highly reprehensible.  He caused Plaintiff substantial emotional harm.  His demands to Plaintiff and his employees to partake in Jewish rules and traditions were part of a pattern and practice.

The court finds $200,000 in punitive damages is sufficient but no greater than necessary to punish Fundomate and deter future wrongdoing.  This award constitutes 0.47% of Fundomate's net worth.  Day 1 Tr. 79:2–7; Trial Ex. 14.  The ratio of punitive damages ($200,000) to compensatory damages ($100,000) is two.

### C.    Conclusion Regarding Punitive Damages

In sum, the court AWARDS Plaintiff $200,000 in punitive damages pursuant to his claim for fraudulent inducement against Fundomate and Schapiro, and $200,000 in punitive damages pursuant to his claims for religious harassment and failure to prevent discrimination and harassment against Fundomate.

51

## X.      **Prejudgment Interest**

Plaintiff seeks prejudgment interest pursuant to Cal. Lab. Code § 218.6 (titled,
"Actions for nonpayment of wages; award of interest") and Cal. Civ. Code § 3289
(titled, "Rate of interest chargeable after breach of contract") at a rate of 10% per
annum based on a breach "arising upon termination of employment [on] November
18, 2020." Pl.'s Mem. at 16.

Under Cal. Labor Code § 218.6, "[i]n any action brought for the nonpayment of
wages, the court shall award interest on all due and unpaid wages at the rate of interest
specified in [Cal. Civ. Code. § 3289(b)], which shall accrue from the date that the
wages were due and payable …." Pursuant to Cal. Civ. Code § 3289(b), if a contract
"does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of
10 percent per annum after a breach." Prejudgment interest accrues on vacation pay,
but not on a waiting time penalty. *Drumm*, 695 F. Supp. 2d at 1021–22.

Plaintiff is entitled to prejudgment interest on a principal amount of $5,048.08
(the amount of unpaid PTO) at 10% per annum for 1,595 days, *i.e.*, the number of
days between November 18, 2020, when his PTO was due and payable, and March 31,
2025, the date of this Order and concurrent Judgment. This amounts to $2,205.94
((($5,048.08 * 0.10) / 365 days per year) * 1,595 days = $2,205.94).

The court, thus, AWARDS Plaintiff $2,205.94 in prejudgment interest on his
unpaid wages.

## XI.     **Attorney's Fees and Costs**

Plaintiff requests attorney's fees and costs under Cal. Lab. Code § 218.5. Pl.'s
Mem. at 16. Plaintiff may file a motion for attorney's fees within thirty (30) days of
this Order.

## **CONCLUSION**

For the foregoing reasons, the court:

- FINDS Fundomate, LLC not liable on every claim;

- FINDS Fundomate liable for breach of written contract and AWARDS Plaintiff $5,048.08 in economic damages;

- FINDS Schapiro and Fundomate liable for fraudulent inducement and AWARDS Plaintiff $100,000 in noneconomic damages and $200,000 in punitive damages;

- FINDS Fundomate not liable for religious discrimination;

- FINDS Fundomate liable for religious harassment and AWARDS Plaintiff $100,000 in noneconomic damages and $200,000 in punitive damages;

- FINDS Fundomate liable for failure to prevent discrimination and harassment, but awards no damages;

- FINDS Fundomate not liable for wrongful termination in violation of public policy;

- FINDS Fundomate liable for waiting time penalties in violation of Cal. Lab. Code § 203 and AWARDS Plaintiff $21,634.62; and

- AWARDS Plaintiff $2,205.94 in prejudgment interest.

The court ORDERS judgment be entered in Plaintiff's favor consistent with this Memorandum of Decision.


IT IS SO ORDERED.


Dated: March 31, 2025

FERNANDO L. AENLLE-ROCHA
United States District Judge